513 So.2d 889 (1987)
James E. SCOTT
v.
TRANSPORT INDEMNITY COMPANY.
No. 55564.
Supreme Court of Mississippi.
September 2, 1987.
Rehearing Denied October 28, 1987.
*889 Roy O. Parker, Tupelo, William C. Walker, Jr., University, for appellant.
Thomas A. Wicker, Holland, Ray & Upchurch, W. Scott Collins, Fred M. Bush, Mitchell, McNutt, Bush, Lagrone & Sams, Tupelo, for appellee.
Before ROY NOBLE LEE, P.J., and ROBERTSON and ANDERSON, JJ.
ROBERTSON, Justice, for the Court:

I.
Once again we are confronted with a case that may well be resolved ultimately in favor of the Defendant. That result becomes quite delayed, for the trial court was too quick on the draw, as it directed a defense verdict in the face of evidence which, if believed, might have formed the legally sufficient undergirding for a judgment for plaintiff. We reverse and remand for further proceedings consistent with what we say below.

II.

A.
James Earl Scott, Plaintiff below and Appellant here, is an adult resident citizen of Booneville, Mississippi. He is a truck driver by occupation. In 1977 he purchased a new Freightliner tractor for which he paid $46,699.21. He also purchased a used 1973 Hobbs trailer for approximately $2500.00. Scott operated as an independent owner-operator until January of 1981, at which time he leased his rig to Leeway Truck Lines out of Oklahoma City, Oklahoma, and began driving for Leeway as an independent contractor.
Upon entering this new relationship, Scott was instructed by Leeway that he *891 must secure liability insurance with some acceptable insurer. One option made available to Scott was obtaining liability and collision insurance coverage under Leeway's fleet policy with Transport Indemnity Company, the Defendant below and Appellee here. Because Leeway's fleet policy with Transport covered numerous vehicles owned and leased by Leeway, the rate was considerably less expensive than any Scott could have obtained acting individually.
Significantly, in obtaining coverage through Leeway's fleet policy with Transport, Scott dealt exclusively with Leeway's insurance coordinator, that is, an individual on Leeway's payroll, not Transport's. It appears, however, that Transport allowed Leeway's insurance representative to deal directly with independent contractor truckers such as Scott. Significantly, the Leeway insurance representative explained to Scott that he should state the amount of insurance he wanted
to mean as the amount of investment that I had in my truck in the case it was destroyed and what it would cost me to go out and buy a new piece of equipment and go right back into the business. The insurance man told me I should insure my vehicle or my business for what I felt it was worth and what it would take to replace it to put me back in business. On that basis I asked for $40,000.00 on the tractor and $5,000.00 on the trailer.
Scott did not receive a copy of the insurance policy. Transport claims the master fleet policy was available through Leeway, but does not contest that each individual driver received only a certificate of insurance which did not include the terms of the policy. Scott says he asked for a copy of the fleet policy, but that such was not forthcoming.
In any event, the master fleet policy, under Part VI, Physical Damage Insurance, Section D, states:
"D. HOW WE WILL PAY FOR LOSSES  THE MOST WE WILL PAY. 1. At our option we may:
a. Pay for, repair or replace damaged or stolen property; or
b. Return the stolen property, at our expense. WE will pay for any damage that results to the auto from the theft.
2. The most we will pay for a loss is the smaller of the following amounts:

a. The actual cash value of the damaged or stolen property at the time of loss.
b. The cost of repairing or replacing the damaged or stolen property with other of like kind or quality." [Emphasis added]
Endorsement Number 7 to the policy reads:
"It is hereby understood and agreed that as respects physical and damage insurance, actual cash value is replaced by stated value throughout the policy wherever it may appear."
Substituting the terms stated value for actual cash value in the policy language quoted above, the operative language of the written policy of insurance would read:
"2. The most we will pay for a loss is the smaller of the following amounts:

a. [The stated value] of the damage or stolen property at the time of loss.
b. The cost of repairing or replacing damaged or stolen property with other of like kind or quality." [Emphasis added]
Approximately one year after entering the relationship with Leeway and the contractual coverage with Transport Indemnity Scott increased the stated value of his collision coverage to $55,000.00. He cited inflation as the reason that he wanted to increase his coverage. Scott was later told that the increase had been approved and he received a new certificate along with a new increased premium based on this additional coverage. Again, he was not given a copy of the policy itself. At no time prior to his accident in the vehicle did Leeway, Transport or anyone else furnish Scott a copy of the policy, although he requested one on several occasions.
On June 1, 1981, Scott's vehicle was seriously damaged in a single vehicle accident. Transport's independent adjuster and claims handler originally were of the opinion that the tractor was a "total loss". *892 According to the claims handler he always considered the vehicles to be a total loss, but when he referred the claim to Transport's branch claim manager, Charles Lanphear, he received a memo back advising him to:
(1) Check with Mississippi counsel covering stated value in conjunction with ACV when stated value is drastically greater.
(2) Check to see if we have option to repair vehicle even though it is totaled.
(3) Because insured has paid a premium for specified and stated coverage, we may be cornered.
In another memo entitled "Settlement Negotiations" from the claims adjuster, Joe Howard, to his superior, Charles Lanphear, it was noted,
based on our discussion of this claim with the home office on Friday, July 23, 1982, we feel that we should attempt to settle this claim based on the repair figures.
On Tuesday, July 27, 1982, Transport advised Scott that the company desired to repair the unit based on the repair figure. Scott rejected this proposal. Transport's file revealed the following handwritten memo in Howard's handwriting:
Our repair offer refused. Claimant wants (1) copy of policy and (2) written explanation. Claimant has talked with an attorney. Feels that there is a claim for misrepresentation. I think that we had better settle.
Transport then furnished Scott a copy of the insurance policy and the following explanation:
At this time Transport Indemnity Company is exercising the option to pay for repairs to your tractor involved in this loss in the amount of $20,758.55.
In addition, Transport offered to pay rental on a truck for Scott to use while his was being repaired at a cost of $4500.00 even though such rental was not required by the policy. Scott has refused to have the truck repaired, refused to accept the cost of repair and cost of rental in the total amount of $25,258.55. He has steadfastly maintained that should be paid $55,000.00.

B.
On October 26, 1982, Scott commenced this civil action by filing his complaint in the Circuit Court of Lee County, Mississippi, naming Transport as Defendant. Scott claimed that Transport had breached its insurance contract and sought recovery of the benefits due and payable under the policy. In addition, Scott claimed that Transport had acted in bad faith in withholding payment of his claim. Scott further charged Transport with breach of fiduciary duties owed to him and with fraudulent misrepresentations and in the end made demand for $1,000,000 in compensatory damages and $2,000,000 in punitive or exemplary damages. Plaintiff subsequently amended to increased his damage demand to $4,000,000 plus. Scott also claimed prejudgment interest. Transport answered, admitted that it insured the property, i.e. Scott's tractor and trailer, and stated that under the terms of the policy it had the option to repair. Transport claimed that it had fully offered to perform all of its duties owed under the policy and in law.
The case was called for trial in November of 1983. At the end of Scott's evidence, Transport moved for a directed verdict. The Circuit Court held that, under the language of the insurance contract, Transport was entitled at its option to repair Scott's damaged tractor; that Transport elected this option and offered to pay the cost of such repairs plus the rental of a substitute tractor for thirty working days while the repairs were being made; and that this offer fulfilled its contractual obligations under the contract of insurance. Based upon these findings, the court entered judgment in favor of Scott in the sum of $25,258.55 holding said amount to be full satisfaction of all of Scott's legitimate claims under the insurance contract. Beyond this, the Circuit Court granted Transport's direct verdict and dismissed Scott's claims for fraudulent misrepresentation, for bad faith refusal to pay Scott's insurance claim and, accordingly, entered judgment for Transport and against Scott on *893 Scott's claims for compensatory tort damages and punitive or exemplary damages.
Scott now appeals to this Court, claiming entitlement to more, much more, than $25,258.55.

III.
In the present procedural posture of this appeal, under oftstated guidelines, we consider all of the credible and material evidence in the case in the light most favorable to Plaintiff Scott. Beyond this we indulge in Scott's favor all reasonable inferences which may be drawn from the evidence. We may affirm the findings of the Circuit Court only if we are able to conclude from the record that, with respect to the material facts, no hypothetical reasonable juror could have found for Scott. See, e.g., Hickox By and Through Hickox v. Holleman, 502 So.2d 626, 628 (Miss. 1987); Smith v. Estate of Gilbert, 498 So.2d 823, 825 (Miss. 1986); Evans v. Journeay, 488 So.2d 797, 799 (Miss. 1986); White v. Hancock Bank, 477 So.2d 265, 269 (Miss. 1985).

IV.

A.
In any case such as this, the judicial effort begins with a search for the terms of the insurance contract. Having in mind the somewhat strident contentions of the parties, a few premises that have not aided our search need be made clear.
First, we find Transport expressing considerable outrage that Scott is demanding $54,000.00 when by all accounts, the fair market value of his truck at the time immediately prior to loss was in the vicinity of $25,000.00 or $26,000.00. But there is nothing per se illegal about an insurance contract which allows the insured to state the value of his property and provides that, conditioned upon a certain event, to-wit: the complete destruction of the property, the insurer will pay to the insured the stated amount, notwithstanding that this stated amount may be substantially in excess of the fair market value of the property destroyed. If insurer and insured want to contract on this basis, we have no law that would interfere, nor should we fashion one. After all, we have for years allowed individuals and insurers to enter life insurance contracts on this premise.
Equally unhelpful is Scott's charge that Transport is stealing from its insureds by computing premiums on the basis of a value stated by the insured whereas the contract provides that the insurer will pay only the fair market value of the property in the event of a total loss. There is nothing per se illegal about an insurance agreement such as this, where the insurer eschews any underwriting procedure to value to risk but rather allows the insured to state the value of his property, treating the stated value as a liability limit, and computing the premium on the basis thereof. Such an insurance practice has advantages to both insurer and insured. The self-interest of the insured in wanting to keep his premiums at a reasonable level may be counted upon to prevent him from stating the value too high and, thus, from causing himself to pay excessive premiums. Furthermore, the insured is arguably in a better position to know the value of the property than the insurance company. On the other hand, the insurer saves the expense of an underwriting procedure evaluating independently each risk. Under such a system the stated value and effect operates as a limit of liability in the event of loss of or destruction of the property. It is disingenuous to label theft the charging of premiums upon the basis of the stated value, for there is nothing inherent in such a system which requires or even encourages an insured to exaggerate the value of his property.

B.
These points made, we return to our search for the terms of the insurance contract. We are concerned not nearly so much with labels as with language. The written language of today's policy is without ambiguity. It provides that, in the event of a covered loss, Transport at its sole election may pay the lesser of the stated value of the property at the time of loss or the cost of repairing or replacing *894 the property with other property of like kind or quality. The stated amount on the certificate of insurance functions as the insurer's limit of liability. When read fairly with the remaining language of the policy, we in no way have the sort of ambiguity found in Government Employees Insurance Companies v. Brown, 446 So.2d 1002 (Miss. 1984).
Properly construed, the language of the policy provides that, in the event of a total loss to the property, Transport may discharge its obligations by paying to Scott "the cost of ... replacing the ... property with other of like kind or quality." Thus, if Scott's tractor be deemed a total loss, Transport's obligation would be discharged by payment of the fair market value of the tractor immediately prior to damage unless, of course, it could be shown that replacing the tractor with another tractor of like kind or quality would cost more. It should be added that the language of the policy does not contemplate buying Scott a new tractor. Rather, only one of like kind or quality, one of similar age and condition and, presumably, value.
On the other hand, if the tractor is not totaled, the Transport's obligation is discharged by paying the cost of repairs. This, of course, refers to the cost of restoring the tractor to its previous condition. Our cases have held that the measure of loss in a partial damage claim under the collision coverage of an insurance policy is the difference between the reasonable fair market value of the vehicle immediately prior to the collision and its reasonable fair market value after all reasonable and feasible repairs have been made. In other words, if, in spite of the making of all reasonable and feasible repairs, there remains a loss in fair market value, such deficiency must be added to the cost of repairs, less, of course, the contract deductible, when the insurer pays the claim. Calvert Fire Insurance Co. v. Newman, 240 Miss. 10, 14, 124 So.2d 686, 688 (1960); Potomac Insurance Co. v. Wilkinson, 213 Miss. 520, 530, 57 So.2d 158, 160 (1952).

C.
The content and terms of the insurance contract are not necessarily to be divined exclusively from the printed pages of the fleet policy and Scott's separate insurance certificate. Certain verbal representations made by persons in authority may become equally parts of the contract as, of course, in this state are the terms and provisions of any applicable statutes.
This case requires that we identify with some care the sorts of representations which are properly deemed incorporated into the language of the policy and have those distinguished carefully from the sort of representations which are legally irrelevant. The latter first. An insurance contract, like any other, does not become modified, supplemented or even interpreted by the statements or opinions of agents made unilaterally, only where those statements are supported by considerations or where they are relied upon by the insured to his detriment within the meaning and contemplation of Restatement (Second) of Contracts § 90. See Ford v. Lamar Life Insurance Co., 513 So.2d 880, 887 (Miss. 1987); Southside, Inc. v. Clark, 460 So.2d 113, 115 (Miss. 1984). Fitting into this category are the "it's not a matter of concern," and the "we had better settle" statements made by various representatives of the insurance company.
On the other hand, statements and representations made by Transport's agents before or contemporaneous with entering into the insurance contract may, if relied upon by Scott, become binding. Reserve Life Insurance Co. v. McGee, 444 So.2d 803, 811 (Miss. 1983). This rule applies to formally designated agents of Transport, agents on Transport's payroll or otherwise under formal contractual relationship with Transport and, as well, to those having apparent authority to act for Transport. See McPherson v. McLendon, 221 So.2d 75, 78 (Miss. 1969). Having reference to the facts of this case, if Transport chose to clothe Leeway with apparent authority before the insurance was written and/or before Scott increased his stated amount, Transport may become bound by what Leeway *895 did or said, if Scott gave considerations therefor or relied to his detriment thereon. See Ford v. Lamar Life Insurance Co., 513 So.2d 880, 887 (Miss. 1987); Richard v. Hartford Fire Insurance Co., 256 So.2d 502, 504-05 (Miss. 1972). In this manner the insurance contract by reference to which the present civil action must be adjudged may become supplemented and modified by anything Leeway's insurance representative may have said.

D.
Here we confront questions of fact. Did the Leeway agent have apparent authority to act for Transport and did that agent in fact make representations which are binding upon Transport? We have before us only Scott's version of the matter, and our question is whether his version was sufficient to survive a directed verdict. It will be recalled that Scott's testimony, if believed, was that he was told by the Leeway insurance representative that he should state the value of his property at what he thought it would cost him to get back into the business if his property were stolen or totaled and that, if in fact his property were stolen or totaled, he would be paid that amount. Parenthetically, we should note that Scott's testimony in this regard is less than unequivocal in the sense that we do not consider it one hundred percent certain that the correct interpretation or inference to be drawn is that Scott would be paid the stated amount of the policy even if that amount exceeded the actual cash value. Nevertheless, because of the present procedural posture, we are required to take Scott's testimony as true and to give him the benefit of all reasonable favorable inferences which may be drawn from that evidence. When this is done, we find that Scott established a prima facie case that the Leeway Insurance agent had the authority to act for Transport, that in that capacity the Leeway representative advised Scott as stated above, and that in reliance thereon Scott accepted and entered into the insurance agreement with Transport. The above interpretation is all the more reasonable in view of the fact that Scott requested a copy of the policy but never received one.
But there is a further hurdle Scott must clear before he becomes entitled to reversal. If, the tractor was not a total loss, the trial judge may well have been correct in his holding that Transport had fulfilled its obligations under the policy by the offer it made of the reasonable cost of repair plus rental on a replacement tractor, all amounting to $25,258.55. Scott's evidence regarding the oral modifications of the terms of the insurance contract have no application and give his cause no aid or comfort if the tractor was not a total loss.
Unless provided otherwise by the private law vehicle of the insurance contract, total loss occurs when it is not economically feasible that the property be repaired. More specifically, a total loss occurs when the cost of repairs exceeds the fair market value of the property less salvage value. See Bennett v. Emmco Insurance Co., 215 So.2d 518, 521 (La. App. 1968); Stutes v. Bankers Fire & Marine Insurance Co., 134 So.2d 136, 138 (La. App. 1961); Aetna Casualty & Surety Co. v. Day, 487 So.2d 830, 835 (Miss. 1986); Calvert Fire Insurance Co. v. Newman, 240 Miss. 10, 124 So.2d 686 (1960); Franklin Fire Insurance Co. v. Brewer, 173 Miss. 317, 159 So. 545 (1935); Scottish Union & National Insurance Co. v. Warren Gee Lumber Co., 118 Miss. 740, 80 So. 9 (1918); Palatine Insurance Co. v. Nunn, 99 Miss. 493, 55 So. 44 (1911).
From the evidence before us there can be no doubt that Scott's tractor was seriously damaged. Accepting Transport's version, that the actual cash value was approximately $25,000.00 to $26,000.00 and that the tractor could be repaired for $20,758.55, it would follow as a matter of common sense that, for all practical purposes, we are dealing with a total loss. Beyond this, we have the evidence that the independent claims adjuster employed by Transport and, as well, one of Transport's claims representatives were of the opinion that the tractor was a total loss. Scott certainly took the position that his tractor was a total loss. Taking the evidence and viewing *896 it as we must under the above standards, Scott was entitled to survive a directed verdict.

E.
In sum, on Scott's contract claim, the Circuit Court erred when it sustained Transport's motion for a directed verdict in consequence of which the case must be remanded for a new trial. If on remand the evidence is substantially similar to that in the present record, Scott will be entitled to have the jury consider whether Leeway's insurance representative was clothed by Transport with sufficient authority to make amendments to the written policy which would be binding upon Transport, whether in fact Leeway's agent made any such representations or agreements, and whether Scott accepted or relied to his detriment thereon. Moreover, assuming an answer favorable to Scott on these questions, Scott would be entitled to have the jury consider whether his tractor was a total loss and, if so, whether he was entitled to full contract damages in the amount of $54,000.00 as prayed. Needless to say, the fact that Scott appears entitled to have these issues submitted to the jury is subject to the vagaries of proof upon a second trial, and nothing we say here should be taken as dispositive of the issue should the proof differ.

IV.
Scott claims further that the Circuit Court erred in entering judgment against him upon that portion of his complaint wherein he charged Transport with bad faith refusal to pay his claim. It appears that the Circuit Court's ruling on this issue flowed naturally from the directed verdict granted on the underlying policy contract claim. That is, the Circuit Court, inasmuch as it held that Transport's sole obligation was to pay cost of repairs, necessarily was of the view that Transport's pre-suit and pre-trial position that cost of repairs was its sole obligation was not one which subjected it to a bad faith refusal tort claim. Because we have held that the Circuit Court erred in that regard, it follows that the final judgment entered in favor of Transport on the bad faith refusal/punitive damages claim should be reversed.
On remand, the Circuit Court should be cognizant that our law regarding what must be proved by a plaintiff before the issue of the assessment of punitive damages may be submitted to a jury is "no different in bad faith cases than in other punitive damage cases." State Farm Fire & Casualty Co. v. Simpson, 477 So.2d 242, 250 (Miss. 1985). We repeated the point in Weems v. American Security Insurance Co., 486 So.2d 1222, 1226 (Miss. 1986). By virtue of the positive law of this state, there are two circumstances wherein a party may be assessed with punitive damages: where the evidence establishes that this party acted with malice and where the evidence shows that the defendant acted with gross negligence or reckless disregard for the rights of others. Aetna Casualty & Surety Co. v. Day, 487 So.2d 830, 832 (Miss. 1986); Weems v. American Security Insurance Co., 486 So.2d at 1226.
In this context, we note that no phrase uttered by this Court has been more misused and misunderstood than the "legitimate and arguable reason" language in Standard Life Insurance Co. of Indiana v. Veal, 354 So.2d 239, 247 (Miss. 1978). Veal says that the presence of an arguable reason for failure to pay a claim establishes a defense to the insurer and insulates it from a bad faith refusal tort judgment. But the converse does not follow. The absence of an "arguable reason" does not necessarily establish that the insurer acted with malice or with gross negligence or reckless disregard for the rights of others. Therefore, proof alone that Transport may have acted without an arguable reason for its refusal to pay Scott's demand of $54,000.00 upon his version of the contents of the policy and the total loss to his property does not necessarily establish Scott's entitlement to submit the punitive damages issue to the jury. Aetna Casualty & Surety Co. v. Day, 487 So.2d 830, 832 (Miss. 1986); Weems v. American Security Insurance Co., 486 So.2d 1222, 1226 (Miss. 1986). Rather, at the risk of being repetitious, what Scott must prove before his *897 bad faith refusal/punitive damages may be submitted to the jury is, either, that Transport acted with malice or that Transport acted with gross negligence and reckless disregard for his rights.
Of course, in deciding whether that issue should be submitted to the jury, the court must look at the elements of the bad faith refusal tort claim just enumerated and decide where, under the totality of the circumstances and viewing Transport's conduct in the aggregate, a reasonable hypothetical juror could have found that the bad faith refusal claim has been established. Mississippi Farm Bureau Insurance Co. v. Todd, 492 So.2d 919, 933 (Miss. 1986); Aetna Casualty & Surety Co. v. Day, 487 So.2d at 833-34.

V.
Scott's claims based upon alleged fraudulent misrepresentation are another matter. We find nothing in this record suggesting that Transport has fraudulently misrepresented anything to Scott, or even arguably so. The Circuit Court's judgment dismissing Scott's fraudulent misrepresentation claim is affirmed.

VI.
Scott further claims error in several evidentiary rulings. As we perceive the matter, these followed upon the Circuit Court's view of Scott's contract and bad faith refusal claims. No purpose would be served by pursuing those evidentiary points here, for on remand the case will become governed by the Mississippi Rules of Evidence, for all trials or proceedings had after January 1, 1986.
AFFIRMED IN PART; REVERSED IN PART AND REMANDED.
WALKER, C.J., ROY NOBLE LEE, P.J., DAN M. LEE, PRATHER, SULLIVAN and ANDERSON, JJ., concur.
HAWKINS, P.J., concurs in part and dissents in part by separate written opinion. joined by GRIFFIN, J.
HAWKINS, Presiding Justice, concurring in part and dissenting in part:
Because Transport Indemnity Company (Transport) made no effort to see that the terms of its policy were explained to an insured, leaving it up to an employee of a trucking line to make representations about its policy, and further failed to send Scott a copy of the policy upon demand, it invited the very sort of confusion which existed in this case, and I concur that the circuit judge erred in granting a directed verdict.
I disagree with the view of the majority that there is nothing wrong in permitting property owners to wildly exaggerate the value of their property and secure full coverage in such amount, as well as for insurance companies to knowingly engage in such type contracts. Under the majority view this is perfectly all right on the part of both the insurance company and the insured. (Majority opinion, p. 893) I think such contracts violate public policy.
The sole purpose of property insurance should be to cover actual losses. Any other purpose invites fraud. See: 44 C.J.S. Insurance, §§ 1(b), 6, 7; 45 C.J.S. Insurance, § 911, and cases annotated. Indeed, the defendant's corporate name is Transport Indemnity Company.
I dissent from the majority's conclusion there is a punitive damage jury issue in this case.
It is crystal clear that all Transport could possibly have owed Scott under the written terms of the policy was offered in payment of his claim, which Scott refused. To suggest that Transport had no arguable basis in law to conclude it did not owe him more would be absurd. We have never departed from the rule in Standard Life Insurance Co. of Indiana v. Veal, 354 So.2d 239 (Miss. 1978), that if an insurance company had an arguable basis in law or fact to refuse to pay the insured's demand, this insulates it against any punitive damage claim. Southern United Life Ins. Co. and First State Bank of Waynesboro v. Caves, 481 So.2d 764 (Miss. 1985); Mississippi *898 Farm Bureau Mut. Ins. Co. v. Todd, 492 So.2d 919, 932 (Miss. 1986).
GRIFFIN, J., joins this opinion.