MacDONALD & EVANS,
INC., Plaintiff,

v.

UTICA MUTUAL INSURANCE
CO., Defendant.

Civil Action No. 07–11251–NMG.

United States District Court,
D. Massachusetts.

June 27, 2008.

Dennis J. Artese, Edward J. Stein, Finley T. Harckham, Anderson Kill & Olick, P.C., New York, NY, for Plaintiff.

William A. Schneider, Thomas M. Prokop, Morrison Mahoney LLP, Lawrence M. Slotnick, Law Offices of Lawrence M. Slotnick, Boston, MA, for Defendant.

## MEMORANDUM & ORDER

GORTON, District Judge.

The instant action arises out of a dispute between an insurance company and an insured business with respect to equipment breakdown coverage contained in a commercial property insurance policy.

## I. *Background*

### A. Factual Background

Plaintiff, MacDonald & Evans, Inc. ("MacDonald") is in the commercial printing business. Defendant Utica Mutual Insurance Co. ("Utica") sold MacDonald an insurance policy for property loss and lost profits for the period April 1, 2006 until April 1, 2007 ("the Policy"). On November 21, 2006, a printing press ("the Press") owned by MacDonald and manufactured by KBA North America, Inc. ("KBA") suffered a mechanical breakdown. The next day, MacDonald informed Utica of the breakdown and Utica, in turn, notified the Hartford Steam Boiler Inspection and Insurance Company ("HSB"), which reinsured the mechanical breakdown coverage under the Policy. HSB administered MacDonald's insurance claim ("the Claim") from its inception and is empowered to make coverage determinations with respect to that claim. HSB hired a press consultant, Louis Benbow ("Benbow") to assist it with the claim.

On November 30, 2006, Utica, through HSB, acknowledged its obligation under the Policy to provide coverage and HSB advised MacDonald that Utica would pay to repair the damaged press. At that time, representatives of KBA were already disassembling the Press. There is a dispute as to 1) whether KBA had already ordered parts at that time and 2) the extent to which Utica and HSB, rather than MacDonald, directed the repair effort. As part of the repairs, several damaged components of the Press were shipped to Brodie Systems, Inc. ("Brodie")

for inspection and repair. Brodie reconditioned and refurbished the damaged parts rather than replace them.

When the parts were returned to MacDonald from Brodie in February, 2007, KBA, at MacDonald's request, was selected to perform the labor necessary to reinstall the replaced or repaired parts. The claims handler for HSB assigned to MacDonald's claim, Kevin Stone ("Stone"), expected that once the parts were returned from Brodie and reinstalled, the Press would operate properly. Two cylinders, a bushing and a gear of the Press had to be returned to Brodie after the initial repair attempt because they needed further work. In order for the Press to function properly, it is critical that the cylinders be in perfect condition. MacDonald contends that it requested that the cylinders be replaced rather than returned to Brodie for repair. Utica decided to pay for the repair rather than to replace the cylinders.

When the two cylinders were returned to MacDonald from Brodie for the second time in March, 2007, KBA noted that their geometry had been altered. Benbow requested that the cylinders be installed in the Press and a print test be performed. The print tests revealed that the Press was not printing to commercially acceptable standards and that parts in addition to the cylinders would require further repair. Utica agreed to pay for the purchase of new components from KBA and authorized MacDonald to proceed with the repairs. HSB, having already expended $468,449 to repair the Press, acknowledged that it would cost at least an additional $937,610 to correct the problems identified following the print test. MacDonald did not proceed with the repairs.

On or about April 12, 2007, MacDonald, through its public adjuster, Marvin Milton ("Milton"), told HSB that the Press was a total loss and demanded that HSB replace it with a new press of like kind and quality. It is undisputed that the pre-loss value of the Press was between $500,000 and $600,000. HSB responded to MacDonald that it had the right to repair or replace the Press because HSB deemed the Press repairable and the cost of the contemplated repairs was less than the cost to replace the Press. By letter dated April 24, 2007, Utica advised MacDonald that based on the part delivery times and labor estimates from KBA and allowing for such additional reasonable time as necessary to complete the repairs, all of the work required to restore the press to its pre-loss condition could and should be completed by June 15, 2007.

The parties disagree regarding KBA's view on whether the Press could be repaired to its pre-loss condition by the method for which HSB has agreed to pay. MacDonald contends that 1) in a letter dated April 25, 2007, KBA stated that it did not endorse further repairs to the Press, 2) the extent of damages to the Press is still unknown and 3) the only way to repair the Press adequately would be to ship it to the KBA factory in Germany where it could be properly inspected and restored to factory specifications.

### B. Relevant Provisions of the Contract

Under the Policy, Utica must pay for covered equipment breakdown in one of the following ways:

4.  Loss Payment

a.  In the event of loss or damage covered by this Coverage Form, at our option, we will either: (1) Pay the value of lost or damaged property;

(2) Pay the cost of repairing or replacing the lost or damaged property;

(3) Take all or any part of the property at an agreed or appraised value; or

(4) Repair, rebuild or replace the property with other property of like kind and quality.

The Policy also provides that "Replacement Cost (without deduction for depreciation) replaces Actual Cash Value in the Loss Condition, Valuation of this Coverage Form" (Section 3.a.) and that, with respect to the valuation of lost goods the insurer "will determine the value of Covered Property in the event of loss or damage ... [a]t [replacement cost] as of the time of loss or damage...." (Section 7.a.). Without the replacement cost provision, covered property would be valued according to the actual cash value of the property as of the time of loss or damage.

## C.  Procedural History

On July 9, 2007, MacDonald filed its complaint against Utica 1) seeking declaratory judgment that Utica is liable to MacDonald for the cost of a new press of like kind and quality and for lost earnings suffered by MacDonald in the interim (Count I), 2) alleging breach of contract (Count II) and 3) alleging violations of Chapters 93A ("the Consumer Protection Act") and 176D (which prohibits unfair trade practices and unfair insurance claim settlement practices) (Count III). One month later Utica answered and counterclaimed, seeking declaratory judgment that a) the Policy gives Utica the option to pay the cost of repairing the damaged press and that its obligation is so limited, b) the Policy does not require Utica to pay the cost of repairing damage to the Press caused by ordinary wear and tear and c) MacDonald may not proceed with litigation to recover lost earnings or business interruption expenses that it claims resulted from the mechanical breakdown of the damaged press without first complying with the policy conditions concerning appraisal and/or reference.

The parties filed cross motions for summary judgment on April 30, 2007.

## II.  *Legal Standard for Summary Judgment*

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir.1991)(quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990)). The burden is upon the moving party to show, based upon the pleadings, discovery and affidavits, "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A genuine issue of material fact exists where the evidence with respect to the material fact in dispute "is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

Once the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court must view the entire record in the light most hospitable to the non-moving party and indulge all reasonable inferences in that party's favor. *O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir.1993). If, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate. When the rele-

vant facts are not in dispute, interpretation of the terms of an insurance policy is also a question of law that can be resolved on summary judgment. *See Liberty Mutual Ins. Co. v. Metropolitan Life Ins. Co.*, 260 F.3d 54, 61 (1st Cir.2001).

## III. *Plaintiff's Motion for Partial Summary Judgment*

In its motion for partial summary judgment, MacDonald seeks a declaration that the Press is a "total loss" and that therefore Utica must pay for the cost of a new replacement press of like kind and quality as long as MacDonald orders such a press.

### A. Definition of Total Loss

Rather than relying on the language contained in the Policy, MacDonald points to a purported doctrine of insurance law to argue that Utica is required to replace the Press because it is a "total loss". Citing *Couch on Insurance*, MacDonald avers that an item is a "total loss" when the cost to repair exceeds the pre-loss value of the property. Because the value of the Press was between $500,000 and $600,000 prior to the breakdown and the total repairs Utica and HSB were prepared to pay for amounted to at least $1.4 million, MacDonald seeks a declaration that the Press is a "total loss" and that therefore it is entitled to the cost of a replacement press.

Citing *Black's Law Dictionary*, Utica responds that the term total loss refers to insured property so badly damaged as to be irreparable or unrecoverable or when so little salvageable remains that it no longer has any value. Utica argues that it is a doctrine used to protect the insurer from paying in excess of the maximum value of the policy.

Review of the case law reveals that "total loss" and "constructive total loss" are doctrines employed by courts in insurance disputes but their definitions are not as uniform as the parties suggest. Outside of the maritime context, courts have used the term "total loss" to describe both an irreparable piece of property and a piece of property the pre-loss value of which is less than the cost of repair. *See Lee v. Louisiana Farm Bureau Ins. Co.*, 532 So.2d 486, 488 (La.App.1988)(holding that an automobile is determined to be a total loss when the cost of repair exceeds its pre-accident value); *Springfield Fire & Marine Ins. Co. v. Shapoff*, 179 Ky. 804, 201 S.W. 1116, 1118 (1918)(holding that a total loss "may mean only that the stock of goods is rendered valueless"); *Springfield Fire & Marine Ins. Co. v. Homewood*, 32 Okla. 521, 122 P. 196, 197 (1912)(holding that total loss means that the property has been destroyed so as to deprive it of the character in which it was insured). Although the First Circuit Court of Appeals, in a case involving a vessel, has defined "constructive total loss" as occurring when "the cost of repairing the ship is greater than its fair market value immediately before the casualty", *DiMillo v. Sheepscot Pilots, Inc.*, 870 F.2d 746, 751 (1st Cir.1989), it is not clear if there is a uniform definition of total loss under Massachusetts law.

### B. Applicability of Total Loss to this Case

MacDonald contends that its proposed definition of total loss applies in this case where the cost to repair the Press exceeds its pre-loss value and precludes Utica from exercising its option of repair. In its opposition to Utica's motion for summary judgment, MacDonald relies primarily on a case decided by the Supreme Court of Mississippi to demonstrate the applicability of that definition. *See Scott v. Transport Indemnity Co.*, 513 So.2d 889 (Miss.1987). That case lends limited support to MacDonald's argument, however, because, although the Mississippi court de-

fines total loss as occurring when the cost of repairs exceeds the fair market value of the property less salvage value, it does not make that calculation in determining whether the property damaged was a total loss. Instead, after stating that the cost of repair is less than the pre-loss value of the property, it holds that the jury should decide whether the property is a total loss. *Scott*, 513 So.2d at 895–96.

Moreover, although MacDonald contends that the total loss doctrine is a generally accepted doctrine of law that applies in this case even in spite of the fact that the words "total loss" do not appear in the Policy, MacDonald has cited no authority binding on this Court that applies the doctrine of total loss in a case involving a replacement cost insurance policy. As Utica points out, because it is responsible for the replacement cost of the Press under the terms of the Policy, it does not make sense to apply MacDonald's interpretation of the total loss doctrine in this case. Limiting recovery to the pre-loss value of the property prevents insurance companies from being required to pay more for repairs than it contemplated paying under an insurance policy that insures the pre-loss value of the property. In this case, in which MacDonald is insured up to the replacement cost of the Press, the cost of the proposed repairs to the Press is less than the value of the Policy (i.e., the replacement cost). Consequently, under the terms of the Policy, Utica is afforded the opportunity to choose the least expensive option whether that be to repair or to replace the Press.

MacDonald suggests that because a replacement cost policy offers more and better coverage, such a policy should not require the cost of repairs to be greater in order to trigger Utica's duty (or, more accurately, create incentive for Utica) to replace the Press. It contends that the formula for determining total loss of damaged property has its origins in concepts of economic waste and is not tied to the nature of the insurance policy at issue. These arguments are unconvincing. MacDonald has greater coverage under a replacement policy because Utica must reimburse its insured up to the replacement cost of the Press in its effort to repair or replace the Press. If MacDonald had actual cash value coverage only, Utica could satisfy its obligation under the Policy by paying $600,000, the actual cash value of the Press pre-loss. As to MacDonald's economic efficiency argument, even if efficiency was the rationale for calculating total loss in the manner that MacDonald suggests (a conclusion the Court doubts), in a replacement cost policy, it would be wasteful for an insurer to pay for a new press when an old press could be repaired at less expense.

The void in the logic of MacDonald's position is dramatically illustrated by applying MacDonald's interpretation of the total loss doctrine in this case. If the Court were to allow MacDonald's motion for summary judgment, the result would be that anytime the Press suffered a breakdown in which the cost of repair exceeded $600,000, Utica would be required to replace the Press to the tune of $2.6 million. Such a result would abrogate the contract in which Utica has the option to repair or replace.

As explained in more detail below, MacDonald may still be able to demonstrate that the Press is a "total loss" if it can demonstrate that the Press was not repairable. MacDonald is not entitled to such a declaration as a matter of law, however, based on the pre-loss value and cost of repair. MacDonald's motion for partial summary judgment will be denied.

### IV. *Defendant's Motion for Summary Judgment*

Utica argues, in its motion for summary judgment, that it has the legal right to choose whether to repair or replace damaged property and that Utica has elected to repair the Press. It moves this Court to declare that MacDonald has no legal right to force Utica to replace the Press with a new one and that Utica's liability for indirect loss ended on June 15, 2007. Utica also contends that MacDonald has no reasonable expectation of proving that Utica is liable for any alleged violation of M.G.L. c. 93A, § 11.

### A. Declaration With Respect to Utica's Right to Choose to Repair

Utica argues in its motion for summary judgment that MacDonald has no legal right to force it to replace the Press with a new one. It does not address, however, MacDonald's allegations that the way in which Utica attempted to repair the Press resulted in a breach of the insurance contract or that Utica has failed to pay for all of the costs incurred by MacDonald in connection with the repairs undertaken. Consequently, there remains a genuine issue of material fact as to those allegations.

### 1. Utica's Discretion to Choose to Repair

### a. Policy Language

Utica first contends that by the plain terms of the Policy, it has "unfettered and complete discretion" to decide whether to pay for repairs to the Press or to replace it. The Policy states: "In the event of loss or damage covered by this Coverage Form, at our option, we will either ..." and then lists the options of repairing, replacing, etc. There is no dispute that "our" refers to Utica. The plain language of the Policy indicates that the insurance company may decide whether to replace or repair the damaged equipment. A policy that contains express provisions that are definitive and unambiguous must be enforced in accordance with its terms. *Stankus v. N.Y. Life Ins. Co.*, 312 Mass. 366, 369, 44 N.E.2d 687 (1942).

### b. Reasonable Expectations

MacDonald responds that Utica's interpretation of the contract, i.e., that the insurer has absolute and continuous discretion to make the coverage decision, contravenes MacDonald's reasonable expectations regarding the extent of the coverage and therefore cannot be enforced. *See Hakim v. Mass. Insurers' Insolvency Fund*, 424 Mass. 275, 282, 675 N.E.2d 1161 (1997). MacDonald notes that it bought replacement cost coverage which provides more and better insurance than does an actual cash value policy. Under Utica's theory of coverage, MacDonald contends, repairs to the Press could go on for years until $2.6 million (the cost of a new press) had been spent and meanwhile MacDonald's business would suffer unacceptable interruption.

MacDonald also notes that when Utica decided to order replacement cylinders for the Press in an effort to fix it, the manufacturer did not endorse further repairs, expressed serious doubts as to whether the Press would thereafter function properly and could not predict the long-term viability and acceptable operation of the Press. MacDonald argues that its reasonable expectations of coverage under the Policy included prompt restoration of the Press and do not comport with allowing Utica to continue to make ineffective repairs that would inevitably cause business disruption to MacDonald.

MacDonald's argument, although couched in terms of an assertion that Utica

lacks unfettered discretion to choose whether to replace or repair the Press, is more compelling with respect to Utica's responsibilities once it has elected its course of action. Nevertheless, under the policy provisions, Utica has the right to choose whether to repair or replace the Press even if the cost to repair exceeds the cost of replacement. Consequently, summary judgment in Utica's favor will not be denied on that ground.

### c. The Total Loss Doctrine

MacDonald also argues in its opposition (as it did in its own motion for partial summary judgment) that because the Press is a total loss, Utica is precluded from exercising its option of repair. As explained above, MacDonald's contention that Utica must replace the Press when the cost of repair exceeds the pre-loss value of the Press is untenable and therefore summary judgment for Utica will not be denied on that ground.

### 2. Utica's Ability and Effort to Repair the Press

MacDonald next responds to Utica's motion for summary judgment that even if Utica had discretion to repair the Press, genuine issues of material fact exist concerning whether the Press can be repaired and whether Utica's on-going effort to repair breached the Policy.

### a. Utica's Ability to Repair the Press

■ Because the parties dispute whether the Press can be repaired in the manner that Utica proposes, MacDonald contends that summary judgment should be denied. It argues that the only way to repair the Press would be to ship it to the KBA factory in Germany where it could be inspected and restored to factory specifications, which would be cost prohibitive. Utica counters that the risk that repairs

might not be successful falls on Utica and that it is entitled to accept such a risk. If the Press is, in fact, irreparable, however, attempts to repair it would be futile and thus constitute a breach of Utica's obligations under the Policy. Utica has not presented undisputed evidence that the Press can be repaired as proposed and, consequently, there exist genuine issues of material fact as to whether Utica has breached the insurance contract by pursuing a course of action that will neither repair nor replace the damaged property.

### b. Utica's Effort to Repair the Press

■ Once Utica elected to repair the Press, Massachusetts law requires that such repairs take place promptly. *See Williams v. Gulf Ins. Co.*, 39 Mass.App.Ct. 432, 435, 657 N.E.2d 240 (1995). MacDonald's arguments regarding its reasonable expectations of coverage, as discussed above, are persuasive with respect to its claim that Utica breached its duty to repair the Press promptly and breached the implied covenant of good faith and fair dealing. MacDonald has presented evidence that Utica's coverage decisions improperly delayed the restoration of a working press for MacDonald. Whether such delays occurred and/or constitute a breach of contract is a genuine issue of material fact to be resolved by the factfinder.

### B. The Period of Restoration

■ Utica also seeks a declaratory judgment from this Court that the "period of restoration" during which Utica must pay MacDonald's lost profits, ended on June 15, 2007. Utica argues that 1) the Press could have been operational by June 15, 2007, but for MacDonald's decision not to continue with the repair effort, 2) the "acts and decisions" exclusion under the Policy applies here to cut off the period of restoration and 3) MacDonald refused to

permit Utica to continue its repair efforts. MacDonald responds that the "acts and decisions" clause has no applicability in this case because the Massachusetts Supreme Judicial Court has found clauses such as the "acts and decisions" clause ambiguous and unenforceable. *See Jussim v. Mass. Bay Ins. Co.*, 33 Mass.App. Ct. 235, 597 N.E.2d 1379 (1992), *aff'd* 415 Mass. 24, 610 N.E.2d 954 (1993). Moreover, MacDonald insists that it did not act or make a decision that resulted in the crash of the Press and therefore the "acts and decisions" clause is not applicable. *Cf. Jernigan v. Nationwide Mut. Ins. Co.*, 2006 WL 463521 (N.D.Cal. Feb.27, 2006). MacDonald has presented evidence that the repairs Utica suggested would not have restored the Press to its pre-breakdown operational state. Consequently, whether the Press could have been repaired by June 15, 2007 but for MacDonald's refusal to attempt the repairs is a genuine issue of material fact and therefore summary judgment on Utica's counterclaim is not appropriate.

### C. Chapter 93A Claim

■ Massachusetts General Laws Chapter 93A, § 2 prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." MacDonald argues that Utica has violated that chapter because 1) Utica's liability to replace the Press has become reasonably clear, 2) Utica has failed, in bad faith, to replace the Press and 3) Utica violated M.G.L. c. 176D, § 3(9)(g) by improperly compelling MacDonald to institute litigation to recover an insurance claim by offering it substantially less than it was entitled to under the Policy (i.e., ineffectual repairs rather than replacement). Utica claims that MacDonald cannot make the required showing as a matter of law and therefore summary judgment is appropriate.

Utica first contends that Section 11 of Chapter 93A does not provide MacDonald with an independent right of recovery against Utica for violations of Chapter 176D and therefore Utica is entitled to summary judgment on Count Three of the Complaint to the extent that MacDonald relies on violations of Chapter 176D. Although Utica is correct that Chapter 176D violations do not allow automatic recovery under Chapter 93A, § 11 (which deals with conduct between businesses), *Polaroid Corp. v. Travelers Indem. Co.*, 414 Mass. 747, 754, 610 N.E.2d 912 (1993), a Chapter 176D violation may be evidence of a Chapter 93A, § 11 violation. Consequently, summary judgment is not appropriate on that ground.

■ Utica's other arguments with respect to the Chapter 93A claim are equally unconvincing. It has failed to demonstrate that no genuine issue of material fact exists. MacDonald asserts that under Massachusetts law, a breach of the implied covenant of good faith and fair dealing may constitute an unfair or deceptive act for the purposes of M.G.L. c. 93A. *Mass. Employers Ins. Exch. v. Propac–Mass, Inc.*, 420 Mass. 39, 43, 648 N.E.2d 435 (1995). It argues that 1) Utica's decision to spend over $1.5 million over the course of seven months to repair a press that had a maximum pre-loss value of $600,000, 2) the fact that three prior attempts at repair have failed, 3) Utica's failure to reimburse MacDonald for all of the costs incurred in connection with the approved repair efforts performed to date and 4) its calculation of MacDonald's lost profits at zero suggests bad faith and that the Utica is making decisions with something other than the interest of its insured in mind.

A genuine issue of material fact exists as to whether Utica failed to pay for the replacement of the Press after the irreparable state of the Press had become

reasonably clear. Those issues must be resolved at trial by the trier ·of fact. Consequently, Utica's motion for summary judgment will, with respect to the 93A claim, be denied.

## ORDER

In accordance with the foregoing, the Plaintiff's Motion for Partial Summary Judgment (Docket No. 21) and the Defendant's Motion for Summary Judgment (Docket No. 17) are **DENIED.**

**So ordered.**