513 So.2d 880 (1987)
Tommie Lee FORD
v.
The LAMAR LIFE Insurance Company.
No. 56480.
Supreme Court of Mississippi.
August 26, 1987.
Rehearing Denied October 28, 1987.
Ben M. Caldwell, Caldwell & Lewis, Marks, for appellant.
Clifford K. Bailey, III, Wells, Wells, Marble & Hurst, Jackson, for appellee.
Before the Court en banc.
WALKER, C.J., for the Court:
On December 28, 1981, Tommie Lee Ford, widow of John Ford, filed a complaint against Lamar Life Insurance Company in *881 the Chancery Court of Quitman County. She alleged that her husband, at the time of his death, was covered by a $100,000.00 life insurance policy by virtue of a temporary contract of insurance with Lamar Life. The trial court sustained Lamar Life's demurrer, and Tommie Lee Ford appealed to this Court. We reversed the chancery court's judgment and remanded the cause for a trial on the merits. Ford v. Lamar Life Insurance Company, 449 So.2d 1204 (Miss. 1984). After trial, the Chancery Court of Quitman County, finding that John Ford had not been insurable as a standard risk, entered judgment for Lamar Life. From that judgment Tommie Lee Ford has appealed. We affirm.

FACTS
John Ford was a sixty-five (65) year old farmer who, along with his wife Tommie Lee, had lived in Quitman County for more than forty (40) years. The Fords were acquainted with William D. "Bill" Gooch, a Lamar Life general agent, who also lived in Quitman County. John Ford and Gooch had on occasion discussed John's need for life insurance, and on May 18, 1981, John Ford submitted to Gooch an application for a $100,000.00 life insurance policy with Lamar Life. The application provided, "No agent or any other person except an Officer of the Company, has power to make, modify or discharge any insurance contract, or to bind the Company by making any promises respecting any insurance contract." Along with the application John Ford gave Gooch a check in the amount of $2,512.00 for the first annual premium. Gooch gave Ford a conditional receipt which read as follows:
CONDITIONAL RECEIPT
THIS RECEIPT DOES NOT PROVIDE ANY INSURANCE UNTIL AFTER ITS CONDITIONS ARE MET. NO AGENT HAS ANY AUTHORITY TO WAIVE OR ALTER THE PROVISIONS OF THIS RECEIPT.
Received from John B. Ford in connection with an application for insurance bearing the same number as this receipt the sum of $2,512.00 in connection with life insurance or annuity applied for and $ ____ in connection with health insurance applied for.
If the payment is for the full first premium at the payment interval selected on the insurance applied for, the insurance will be effective in accordance with the provisions of this receipt.
This receipt is void if the payment acknowledged is:
1. less than such first premium or
2. by check which is postdated or not honored upon presentation.
EFFECTIVE DATE IF INSURABLE AS APPLIED FOR
If the Company finds to its satisfaction that all persons proposed for insurance were insurable as standard risks on the effective date under the Company's rules for insurance on the plan and for the amount applied for, the insurance shall be in effect on the latest of the following dates:
1. The date, if any, requested in the application.
2. The date of the last medical exam required by the Company.
3. The date of the application.
The day he received this receipt, John Ford underwent the first of several medical tests used to diagnose diabetes. Because these test results were crucial to Lamar Life's determination of insurability, an explanation of the tests is appropriate at this point. When a urinalysis is performed, the urine specimen may be tested for sugar by the "TesTape" method. A strip of treated tape is dipped into the specimen of urine, and a physician may make a preliminary determination of the amount of sugar in the urine based on the color produced on the tape. Results of this test are measured on the following scale:

*882
 0 normal
 trace a trace of sugar, which is often present
 even in normal specimens
 1+ Although no specific significance is given
 for these readings, they do indicate that
 sugar is present in the urine,
 2+ and the higher the number, the more sugar in
 the urine. It is undisputed that "3+" is
 abnormally high.
 3+

If the TesTape reveals a high concentration of sugar in the urine, physicians often perform a test which is more exact, i.e., a microscopic analysis of the urine specimen. The results of this test are described in terms of X grams of sugar per 100 milliliters of urine. For example, a result of 0.5 gm. % on this test would indicate that the specimen contained 0.5 grams of sugar per 100 milliliters of urine. On this test, a result of 0.3  0.5 gm. % would be normal, but a result of 1.10 gm. % would be abnormally high.
Although these urine tests are often used to determine whether further tests are necessary, the urine tests themselves are not considered very accurate. The record indicates that a physician would not use a urine test to make a positive diagnosis of diabetes. Instead he would require a blood sugar test. Moreover, an insurance company which had received a urine sugar result of 1.10 gm. % on an applicant would require blood sugar tests before being satisfied that the applicant was insurable. The reason that a blood test is required for a diagnosis of diabetes is this: sugar in the urine is only a reflection, and sometimes an inaccurate one, of sugar in the blood, the latter of which is the true indicator of diabetes and related problems.
The meaning of blood sugar readings varies depending on whether the test is a fasting blood sugar (FBS), a blood sugar one hour after a meal, or a blood sugar two hours after a meal. The upper limits of normal for an FBS would be in the range 130-140, while blood sugars taken after a meal would normally be higher. Any blood sugar over 200 is considered abnormal, regardless of when taken.
In a physical examination conducted in 1980 (not related to the 1981 application for insurance) John Ford showed a fasting blood sugar of 137. This reading is normal, by medical standards, for a sixty-five (65) year old man. Whether it is normal by underwriting standards is discussed hereinafter.
On May 18, 1981, John Ford went to the office of Dr. M.B. Lynch, who was the Fords' family physician and who performed Lamar Life's physical examinations for insurance purposes in Quitman County. The examination was to be conducted at Lamar Life's expense. Because the tests done that day revealed a urine sugar level of 3 + and a blood sugar level of 250 (both abnormally high), the examination was postponed. Believing that the high levels of sugar could have resulted from Ford's eating too many sweets, Dr. Lynch instructed Ford to "eat right" and come back in a few days. Lamar Life did not learn of these results until pre-trial discovery, i.e., these results were not considered in determining insurability.
On May 21, 1981, John Ford returned to Dr. Lynch's office for the examination. Tests revealed urine sugars of 3 + and 1.10 gm. % (both abnormal and both reported to Lamar Life) and blood sugar of 230 (abnormal; not requested by, or reported to, Lamar Life). Based on these results, Dr. Lynch put Ford on a 2500 calorie per day diet recommended by the American Diabetes Association.
Because these test results were abnormally high, Lamar Life requested that Gooch 1) obtain another urine test and 2) have Ford complete a "diabetic questionnaire." A TesTape test (the scale for which is 0, trace, 1 +, 2 +, 3 +) was conducted *883 on May 29, 1981, and revealed a trace of sugar in John Ford's urine. This result, which was sent to Lamar Life, caused Dr. Lynch to believe that John Ford's "diabetes was going away." No blood test was done that day because Dr. Lynch wanted to wait "until it stayed down a while and then run a blood sugar."
On June 1, 1981, Gooch, apparently having learned of the "trace" result, went to the Ford residence at approximately 6:30 a.m. Tommie Lee Ford testified that she did not know whether Gooch had planned to visit them that morning, or whether he had been out for his morning exercise and had decided to stop. In any event, Gooch, told the Fords that John's specimen was clear, and that he was insured.
The following day John Ford was killed in an automobile collision. The day after Ford's death Lamar Life closed its file on him. Although it is not clear when Tommie Lee Ford filed a claim on the policy, the record indicates that on June 29, 1981, Jack P. Dean, President of Lamar Life, wrote to Tommie Lee Ford, denying coverage and tendering a check for the premium, plus interest. Tommie Lee Ford returned the check.
On December 28, 1981, Tommie Lee Ford filed suit against Lamar Life, alleging that a temporary contract of insurance existed at the time of her husband's death and seeking the face value of the policy, $100,000.00. As noted above, the trial court sustained Lamar Life's demurrer, and this Court, on appeal, remanded the cause for a trial on the merits to determine whether Ford had been insurable as a standard risk.
The evidence at trial revealed that, although the conditional receipt referred to the company's rules for insurance, Lamar Life had no rules of its own. Instead, it used the rules of four (4) companies with whom it had re-insurance treaties: Lincoln National, North American Reassurance, Connecticut General, and General Reassurance.
The following excerpt from Lincoln National's manual shows that company's acceptable limits for urine sugar.

 ACCEPTABLE LIMITS
 (in gms%)
 Amount of Insurance
Specific to $25,001- $100,001- over
Gravity $25,000* 100,000 500,000 $500,000
less than
1.015 PRN to 0.35 to 0.25 0
1.015 up PRN to 0.50 to 0.35 to 0.10
* Consider making an appraisal without obtaining an OGTT.

Ford had applied for a $100,000.00 policy, and the specific gravity of his urine specimen was above 1.015. Therefore, any urine sugar above 0.50 gm. % would be above acceptable limits. Ford tested, on May 21, at 1.10 gm. %. According to the Lincoln National Manual, any result above acceptable limits indicated that a glucose tolerance test should be obtained. Apparently, if Lamar Life had followed this manual, they would have required a glucose tolerance test to determine whether Ford was insurable as a standard risk. No such test was done in 1981. The FBS performed during an annual physical in 1980 showed a result of 137. Tommy Lee Ford emphasizes that, according to Lincoln's table (reproduced below) an FBS of 137 for a man over thirty (30) would have required only two (2) points, and a total of only two (2) points would have been rated as a standard risk. Tommie Lee Ford ignores, however, that an entire glucose tolerance test is required, and that the one-hour and two-hour blood sugars, which were not available on Ford, would have been added to the FBS points to determine the rating.

*884 OGTT RATING SCHEDULE
Determine fasting, one hour*, and two hour (plasma[**]) sugar levels from the oral glucose tolerance test.
Using the results as determined in Step 1, enter the POINT CHART and add the points for all three time intervals (fasting, one hour*and two hour).
Using the total points, enter DEBIT TABLE to obtain rating.

 POINT CHART
 Plasma Sugar Level (mgms%)
Points Fasting One Hour Two Hour
 0 to 114 to 199 to 139
 1 115-129 200-229 140-169
 2 130-139 230-259 170-199
 3 140 up 260 up 200 up
 DEBIT TABLE
Points Ages 0-29 Ages 30 up
 0-2 0 0
 3 50 0-25
 4* 75 50
 5* 100-150 75-100
 6 up rate as DIABETES-DISCOVERED ON CURRENT EXAM
* If family history positive for diabetes, rate as DIABETES-DISCOVERED ON CURRENT EXAM.

Reproduced below is a section from North American Reassurance's manual:

 RATING SCHEDULE FOR GLYCOSURIA FINDINGS:
 .1% to .3% .3% to .5% .5% to 1.% 1.% to 2.%
Isolated 0 to 25 25 to 50 50 to 75 75 to 150
Intermittent 25 to 50 50 to 100 100 to 200 200 to 400
Constant 25 to 75 75 to 150 150 to 300 300 to PP*
* Constant glycosuria of 2.0% up requires a G.T.T.

As is seen from this table, even an isolated finding of 1.10 gm. % would have required the underwriter to add 75-150 debits to the applicant's insurability rating. The record indicates that when an applicant had debits, Lamar Life would not insure that applicant as a standard risk, and would either insure at a higher premium, based on the number of debits, or not insure at all.
The following are acceptable blood sugars as listed in Connecticut General's manual.

 Fasting 130
 1 hour 195
 2 hours 140

In cases where diabetes was suspected (which it apparently was in Ford's case after the 1.10 gm. % result), Connecticut General required a glucose tolerance test to determine insurability. Although no test was obtained before Ford's death, a test from 1980 showed an FBS of 137, which, according to the table, would require a diabetes rating.
General Reassurance's manual was not offered into evidence. Lamar Life's Vice-President for Underwriting, Waldemar H. Luehlfing, testified that, to the best of his recollection, General Reassurance's limits were 0.5 gm. % for urine sugar and 135 for FBS. Ford's urine sugar of 1.10 gm. % and FBS of 137 were above those limits.
*885 Dr. Wooten, who examined Ford annually but did not perform the Lamar Life physical, testified that Ford's 137 FBS in 1980 was "pretty normal" for a man his age. He further testified that he considered Ford insurable in 1980. He also testified that if Ford were otherwise insurable and had only a trace of sugar in the urine (which he did on the May 29 test), he would be a standard risk. He stated, however, that after a 1.10 gm. % result, he would want three (3) or four (4) blood sugar tests before he considered the high reading to be an accident.
Dr. James McAfee, who had never examined John Ford, testified that a 3 + urine sugar was abnormal, but that an FBS of 137 was normal for a sixty-five (65) year old man.
Dr. M.B. Lynch, Ford's family physician and Lamar Life's examining physician, testified that the "trace" rating on May 29 meant that John Ford's "diabetes was going away," but admitted that "you can't depend on [urine sugar] too good."
At the conclusion of the trial, the chancellor took the case under advisement, and he later issued "Findings of Fact and Legal Conclusions." He ruled, in essence, that John Ford had not been insurable as a standard risk under any of the manuals used by Lamar Life, and that Lamar Life therefore was not liable. From the trial court's judgment, Tommie Lee Ford has appealed to this Court, assigning five (5) errors.
I. JOHN FORD WAS INSURED BY LAMAR LIFE AT THE TIME OF HIS DEATH.
II. LAMAR LIFE HAD NO RULES FOR INSURANCE, ALTHOUGH IT REFERRED TO SUCH IN THE CONDITIONAL RECEIPT.
III. LAMAR LIFE WAS BOUND BY THE ACTIONS OF ITS GENERAL AGENT, WILLIAM GOOCH.
IV. THE CONDITIONAL RECEIPT WAS AMBIGUOUS AND INEQUITABLE.
V. THE CHANCELLOR'S FINDING OF FACT AND LEGAL CONCLUSIONS ARE CONTRARY TO THE OVERWHELMING WEIGHT OF THE EVIDENCE.
Because I and V both deal with the chancellor's findings of fact, we combine them and address the four (4) issues actually raised.

I. WAS THE CHANCELLOR MANIFESTLY WRONG IN FINDING THAT JOHN FORD WAS NOT INSURABLE AS A STANDARD RISK, AND THAT HE WAS THEREFORE NOT INSURED BY LAMAR LIFE AT THE TIME OF HIS DEATH?
The conditional receipt expressly provided that no insurance was in effect until after its conditions were met. Therefore, the company's satisfaction that Ford was insurable as a standard risk according to its rules was a condition precedent to the existence of a contract of insurance. See Franklin Life Insurance Company v. Hamilton, 335 So.2d 119 (Miss. 1976) (insurability as standard risk held condition precedent).
The chancellor made a finding of fact that John Ford was not insurable as a standard risk under any of the four (4) manuals used by Lamar Life. This Court's review of that finding is, according to the familiar rule, limited. A chancellor's finding of fact will not be disturbed on appeal unless it is manifestly wrong. Brown v. Williams, 504 So.2d 1188 (Miss. 1987); Dillon v. Dillon, 498 So.2d 328, 330 (Miss. 1986); Country Club of Jackson v. Saucier, 498 So.2d 337, 339 (Miss. 1986); In the Matter of the Will of Polk, 497 So.2d 815, 818 (Miss. 1986); Devereaux v. Devereaux, 493 So.2d 1310, 1312 (Miss. 1986); Liddell v. Ivory Joe Jones, etc., 482 So.2d 1131, 1133 (Miss. 1986); In re Estate of Perkins, 481 So.2d 836, 839 (Miss. 1985); Carr v. Carr, 480 So.2d 1120, 1122 (Miss. 1985); Bryant and Bryant v. Cameron, 473 So.2d 174, 179 (Miss. 1985); Smith v. Todd, 464 So.2d 1155, 1157 (Miss. 1985); Kelly, et al v. Shoemake, etc., 460 So.2d 811, 817 (Miss. 1984).
As noted in the discussion above of the various manuals, Lincoln National's rules provided that a urine sugar level above *886 0.50 gms. % was "above acceptable limits." Ford's level was 1.10 gms. %, well above the upper limit of 0.50 gms. %. According to North American Reassurance's manual, even an isolated finding of 1.0 gms. % to 2.0 gms. % would require a rating of higher than standard risk. Since Ford's urine sugar level was 1.10 gms. %, he was not insurable as a standard risk by North American's rules. Connecticut General's rules provided that when diabetes was suspected, a glucose tolerance test had to be obtained showing the applicant's fasting blood sugar to be less than 130, else the applicant was not a standard risk. Ford's only available FBS result was 137. He was thus not a standard risk according to Connecticut General's rules. Although General Reassurance's manual was not offered into evidence, Lamar Life's underwriter testified that General Reassurance's limit for urine sugar was 0.50 gms. % and its limit for fasting blood sugar was 135. Tests on Ford had revealed a urine sugar level of 1.10 gms. % and an FBS of 137. He was thus not a standard risk according to General Reassurance's rules.
Tommie Lee Ford argues on appeal, as she did below, that the discovery of only a "trace" of sugar in the May 29 urinalysis rendered her husband insurable as a standard risk. The record reveals, however, that the urine test which revealed a "trace" of sugar was much less reliable than a blood sugar test, which was not performed the day of the "trace" result. There is nothing in the record to indicate that an underwriter's doubts about the insurability of a person with 1.10 gms. % sugar would be allayed by a relatively unreliable finding of a "trace" of sugar.
The chancellor was not manifestly wrong in finding that Ford was not insurable as a standard risk.

II. WAS THE CONDITIONAL RECEIPT, WHICH REFERRED TO THE COMPANY'S RULES FOR INSURANCE WHEN THE COMPANY ACTUALLY HAD FOUR (4) SETS OF RULES, AMBIGUOUS SO AS TO REQUIRE A CONSTRUCTION FAVORABLE TO THE INSURED?
Where the language of an insurance contract is clear and unambiguous, the contract is to be construed as written. Foreman v. Continental Cas. Co., 770 F.2d 487 (5th Cir.1985) (applying Mississippi law); State Farm v. Scitzs, 394 So.2d 1371 (Miss. 1981); Insurance Co. of North America v. Deposit Guaranty Nat. Bank, 258 So.2d 798 (Miss. 1972); Key Life Ins. Co. of S.C. v. Tharp, 253 Miss. 774, 179 So.2d 555 (1965). Where, however, the language of the insurance contract is ambiguous, the language is to be construed in favor of the insured. Gov. Emp. Ins. Co. v. Brown, 446 So.2d 1002 (Miss. 1984); Great Am. Ins. Co. v. Bass, 208 Miss. 436, 44 So.2d 532 (1950).
A conditional receipt similar to the one at issue here was construed in Franklin Insurance Company v. Hamilton, 335 So.2d 119 (Miss. 1976). Hamilton applied for a $25,000.00 life insurance policy, naming his wife as beneficiary. He paid the first monthly premium and was given a conditional receipt, which contained a condition precedent (described as such in the receipt) to the effect that
[i]f the Company at its Home Office shall be satisfied after investigation and medical examination (if required) that on the date hereof or on the date of such medical examination, whichever is later, the Proposed Insured was insurable and entitled under the Company's rules and standards to insurance ..., then the insurance protection applied for shall take effect from said date.
.....
335 So.2d at 120. The company did require a physical examination, which was conducted three (3) days after Hamilton paid the premium and received the conditional receipt. The report, which indicated that Hamilton's at-rest pulse rate was 102, was sent to the company's medical examiner, who determined "sometime thereafter," 335 So.2d at 121, that Hamilton was not insurable at the rate of premium for which he had applied. Apparently intending to offer coverage at a higher premium, the company sought additional medical records. *887 Before this information was received, Hamilton, approximately five (5) weeks after applying for the policy, died of a myocardial infarction, the company having determined that he was not insurable at the premium for which he had applied, but never having determined whether he was insurable at a higher premium. We held that the conditional receipt was unambiguous, that the condition was never fulfilled, and that the policy therefore was not in effect at the time of Hamilton's death. Although not using the words "good faith," we noted that the record showed that Franklin Life was "amply justified" in finding that Hamilton was not insurable. 355 So.2d at 122.
Tommie Lee Ford argues on appeal that language referring to "the company's rules," when the company actually uses four (4) sets of rules, is ambiguous and should be construed in favor of the insured. We agree that the receipt was ambiguous. That holding does not, however, warrant reversal. Once language is determined to be ambiguous, the remedy is to construe that language in favor of the insured. Gov. Emp. Ins. Co., 446 So.2d at 1006. In the instant case, construing the ambiguity in favor of the insured requires using that set of rules under which John Ford was most likely to be insurable as a standard risk. Had he been thus insurable under one of the manuals, Lamar Life would, because of the ambiguity, be liable on the policy. As noted above, however, the chancellor made a finding, supported by the evidence, that John Ford was not insurable as a standard risk under any of the manuals. Therefore, even if the language is construed in favor of the insured, i.e., if the most liberal standard of the four (4) is used, John Ford still was not insurable as a standard risk, and Lamar Life therefore had no liability on the policy.

III. DID LAMAR LIFE'S USE OF FOUR (4) SETS OF RULES REQUIRE A HOLDING THAT THE CONDITION (APPLICANT MUST BE INSURABLE AS A STANDARD RISK UNDER COMPANY'S RULES) COULD NOT BE DETERMINED OBJECTIVELY AND IN GOOD FAITH, AND THAT THE CONDITION THEREFORE WAS OF NO EFFECT?
Neither party cites, nor do we find, a Mississippi case in which multiple sets of rules were used for determining insurability. In a somewhat analogous case involving an engineer's approval as a condition precedent to payment on a contract, we recognized the engineer's duty to make the determination in good faith. City of Mound Bayou v. Roy Collins Const., 499 So.2d 1354, 1359 (Miss. 1986). In Mound Bayou, we quoted Corbin on Contracts for the proposition that "[i]f the experts's refusal of his certificate is not `in good faith,' his certificate will be eliminated as a condition, and the promise of compensation becomes enforceable without it (citation omitted)." Id. The requirements of reasonableness, objectivity and good faith are enforced even more stringently when the party whose duty of performance depends on the condition, rather than a third person, makes the determination as to whether the condition has been satisfied. Restatement (Second) of Contracts § 228 Comment b (1979).
The rationale of Mound Bayou is applicable to conditional receipts for insurance. The insurer must make a good faith, objective determination as to whether the condition has occurred. In cases where the insurance company does not make the determination in good faith, the condition will be eliminated, and coverage will be effective regardless of whether the condition has been met. The record in the case at bar indicates that a good faith, objective determination was made. Lamar Life actually used rules under none of which, despite their multiplicity, John Ford was insurable as a standard risk.

IV. WAS LAMAR LIFE BOUND BY THE STATEMENT OF ITS GENERAL AGENT?
Tommie Lee Ford argues that Gooch bound the company when he told the Fords, on June 2, 1981, that John was insured.
Miss. Code Ann. § 83-17-1 (1972) provides, in pertinent part, that "every person *888 [who performs certain actions] for or on behalf of any insurance company ... shall be held to be the agent of the company ... as to all duties and liabilities imposed by law, whatever conditions or stipulations may be contained in the policy or contract." Miss. Code Ann. § 83-17-1 (emphasis added). The purpose of this statute is to prevent insurers from operating through third persons and later denying responsibility for the acts of those persons. Mitchell v. Aetna Casualty and Surety Company, 579 F.2d 342 (5th Cir.1978).
We construed § 83-17-1 in a case factually similar to the case at bar. Southern United Life Ins. Co. v. Caves, 481 So.2d 764 (Miss. 1985). Elvin Caves obtained a loan from First State Bank of Waynesboro, and during the transaction Sue Tanner, bank officer and agent of Southern United Life, asked Caves whether he wanted credit life insurance. He did. Tanner then asked Caves whether he had undergone a physical examination for his current employment. When Caves indicated that he had, Tanner issued an insurance certificate, although she was aware that Caves had suffered a heart attack approximately eight (8) years earlier. The certificate provided that the company had thirty-one (31) days in which to investigate and accept or reject the insurance. No medical investigation was conducted. Instead the company, as was its custom, simply allowed Tanner to use her discretion to determine whether Caves was insurable. She exercised that discretion by issuing the certificate. Within three (3) weeks, Caves died of a pre-existing heart condition. Only then did Southern Life begin a medical investigation, based on which the company denied the coverage, claiming that Caves had not been in insurable health when the policy was issued.
We affirmed a judgment for Caves, holding that "[w]here an insurance company makes no effort to establish clear and meaningful guidelines to assist its agents in discerning persons eligible for coverage, but merely relies on the agents' judgment to select those persons appearing to be healthy, that company by its actions manifests an intention to `insure the world.'" 481 So.2d at 768. We also noted that the policy contained a clause that "[i]f the debtor should die [before the policy is accepted] the insurance shall be deemed to have been in effect if the company, acting on its regular underwriting methods, would have accepted the insurance." 481 So.2d at 767. Because the regular underwriting method of the company was to do only a character and background investigation, which Caves would have passed, we held that coverage was in effect based on this language.
The general law of agency applies to insurance companies' relationships with their agents. Caves, 481 So.2d 764; Gulf Guaranty Life Ins. Co. v. Middleton, 361 So.2d 1377 (Miss. 1978). One maxim of the law of agency, although not expressly stated in Caves, is that a principal is bound by the actions of its agent within the scope of that agent's real or apparent authority. Baxter Porter & Sons Well Servicing Co., Inc. v. Venture Oil Corp., 488 So.2d 793 (Miss. 1986); Parmes v. Illinois Central Gulf Railroad, 440 So.2d 261 (Miss. 1983); College Life Insurance Co. of America v. Byrd, 367 So.2d 929 (Miss. 1979). One seeking to recover based on the theory of apparent authority must show 1) acts or conduct on the part of the principal indicating the agent's authority, 2) reliance on those acts, and 3) a detrimental change in position. Gulf Guaranty Life v. Middleton, 361 So.2d 1377, 1383 (Miss. 1978); Steen v. Andrews, 223 Miss. 694, 697-98, 78 So.2d 881, 883 (1955). Apparent authority exists when a reasonably prudent person, having knowledge of the nature and usages of the business involved, would be justified in supposing, based on the character of the duties entrusted to the agent, that the agent has the power he is assumed to have. Id.
In the case at bar, Gooch did not have real authority to evaluate risks or bind the company, as the agent in Caves did. This much is clear from the language of the application and receipt, and from the fact that the medical reports and "diabetic questionnaire" had to be sent to the underwriting department for evaluation. Nor did *889 Tommie Lee Ford establish the elements of apparent authority. We have searched the record in vain for any indication that the Fords relied to their detriment on Gooch's statement. John Ford died the day after Gooch made the statement, and Tommie Lee Ford has not alleged or proved that she or her husband made any change in position based on the representation. Gooch, no doubt overzealous to make a sale, assured John Ford that he was covered when the underwriting department had made no such determination.

IN SUMMARY
The record clearly establishes that John Ford was not insurable as a standard risk under any of the four (4) manuals used by Lamar Life. Thus Tommie Lee Ford cannot prevail in her claim that the chancellor was manifestly wrong in finding that John was not insurable as a standard risk.
Equally unavailing to Ford is the theory that the conditional receipt was ambiguous. Even when that ambiguity is resolved in Ford's favor, i.e., when the least stringent standards are used, John Ford still was not insurable as a standard risk. There is no indication that Lamar Life failed to make a good faith determination of insurability.
Finally, Tommie Lee Ford has failed to establish the real or apparent authority of William Gooch; specifically, she has failed to put on any evidence of detrimental reliance.
Because we find no reversible error, we affirm the judgment of the trial court.
AFFIRMED.
ROY NOBLE LEE and HAWKINS, P.JJ., DAN M. LEE, PRATHER, ROBERTSON, SULLIVAN and GRIFFIN, JJ., concur.
ANDERSON, J., not participating.