747 So.2d 863 (1999)
Annie Jewell BARBER, Appellant,
v.
BALBOA LIFE INSURANCE COMPANY, Appellee.
No. 97-CA-00342-COA.
Court of Appeals of Mississippi.
April 20, 1999.
Rehearing Denied July 20, 1999.
*864 J. Andrew Phelps, Mark Thomas Finch, Hattiesburg, Attorneys for Appellant.
J. Robert Ramsay, Sheila Marzoni Bossier, Hattiesburg, Attorneys for Appellee.
EN BANC.
BRIDGES, J., for the Court:
¶ 1. Annie Jewell Barber appeals from the judgment of the Forrest County Chancery Court granting her damages for breach of an insurance contract in the amount of $77,277.57. Aggrieved by the chancery court's ruling, Annie alleges on appeal the following issues: 1) that the chancellor erred in failing to award punitive damages, 2) that the appellant is entitled to an additur as to compensatory damages, 3) that the chancellor's findings were against the overwhelming weight of the evidence as to damages, and 4) that the chancellor erred in denying the appellant's motion for reconsideration. On cross appeal, Balboa Life Insurance Company argues: 1) that the chancellor erred in finding an improper recission of the insurance contract and that the appellee had ratified the insurance contract, resulting in a waiver by the appellee to declare the contract void; and 2) that since the chancellor found that there was a material misrepresentation by the appellants, it was error to award any damages. Finding no merit to the issues raised, we affirm.

FACTS
¶ 2. On February 21, 1992, L.C. Barber (deceased) and Annie Jewell Barber entered into a secured real estate loan with United Companies Mortgage of Tennessee, Inc. The loan was arranged by United's employee, Doug Nobles, and was to be secured by a deed of trust covering the couple's personal residence. Along with the loan, the Barbers also purchased a credit life insurance policy from Balboa Life Insurance Company through United *865 Companies Mortgage of Tennessee, Inc. that would provide death benefits on the life of L.C. Barber. This policy was calculated to coincide roughly with the projected declining balance of the loan for a period of 60 months with United as the creditor beneficiary.
¶ 3. The Barbers entered into a second loan secured by the aforementioned real estate with United on August 24, 1993, and a second credit life insurance policy was purchased with Balboa. This certificate provided joint decreasing life insurance on the lives of both L.C. and Annie for a period of 60 months with United as the creditor beneficiary.
¶ 4. According to the record, it was the practice of United to prepare the loan instruments prior to the closing and to insert the totals that included the cost of the credit life insurance. Then, United would "pitch" the credit life insurance to the borrower at the closing. However, if the borrower declined the credit life insurance, the documents would have to be redone. In addition, pursuant to an agreement between United and Balboa, United received a 45% commission on each sale.
¶ 5. In the case sub judice, L.C. Barber answered "No" on the 1992 application to the question listed under the heading "LIFE" in the footnote below, and both L.C. and Annie Barber answered "No" and initialed their answer on the 1993 transaction.[1] Thus, according to their answers on the applications, the Barbers satisfied the eligibility requirements.
¶ 6. On February 1, 1994, L.C. Barber died as the result of widespread metastatic malignant melanoma. According to the death certificate, the interval between onset and death was 1 ¼ years. At the time of his death, the amounts owing on the loans were $9,792.54 and $7,485.03. Annie *866 Barber submitted a claim to Balboa on February 23, 1994. Wayne Ogasawars, a Balboa claims examiner, sent an unsigned letter to Annie Barber on March 21, 1994, stating that Balboa needed additional information from her husband's physician.
¶ 7. Balboa soon discovered that L.C. Barber had received treatments for hypertension on August 13, 1991, and prior, and that these treatments continued for at least three more occasions throughout 1991 and 1992. In addition, Balboa discovered that L.C. Barber had a cancerous left toe removed in November of 1992.[2] In December of 1993, L.C. Barber was diagnosed with widespread malignant melanoma.
¶ 8. Pursuant to the above findings, Mr. Ogasawara recommended on May 1, 1994, that Balboa rescind the coverage based upon the material misrepresentation of L.C. Barber's prior treatment for high blood pressure. On May 19, 1994, Balboa sent Annie Barber two letters, one for each insurance certificate, rescinding the coverage as of the effective date due to a material misrepresentation. On June 7, 1994, the premium refunds were applied to Annie Barber's outstanding balance; however, no interest was refunded.
¶ 9. Annie Barber filed an action in the Chancery Court of Forrest County on September 22, 1994, against Balboa, United, and United employee, Doug Nobles, seeking specific performance of the credit life insurance certificates. In addition, Annie Barber claimed bad faith, breach of contract, fraud, negligence, and conversion against the defendants, and sought injunctive relief against United to prevent them from collecting or foreclosing on the Barber's property that had been used as security for the loans. A settlement was reached between Annie Barber and United and its employee prior to the chancellor's judgment being rendered.
¶ 10. On August 1, 1996, the chancellor in his findings of facts and conclusions of law found that Balboa had the right to void the contract ab initio based upon the material misrepresentation made by L.C. Barber. However, the chancellor found that Balboa had failed in their effort to rescind the contracts by refunding the premiums to United instead of the Barbers; thus, ratifying and reviving the contracts and waiving their right to void the policies. The chancellor assessed actual damages for breach of the credit life insurance contracts in the amount of $17,277.57, and assessed $10,000.00 in extra-contractual damages for attorney's fees. Additionally, the chancellor found that Balboa had been negligent in unreasonably delaying the investigation of Annie Barber's claim, and awarded her $50,000.00 in damages for mental anguish and emotional distress. The chancellor dismissed the fraud and conversion claim and all other counts of negligence, and denied punitive damages. Mrs. Barber filed a motion for reconsideration which was denied, and this appeal followed.

ARGUMENT AND DISCUSSION OF LAW
¶ 11. Credit life insurance has been recognized to be something different than the normal policy of life insurance. Generally, a policy of life insurance is a standalone contract whose purpose is to provide a sum of money to the named beneficiary upon the death of the listed insured. A credit life insurance policy, on the other hand, is an integral part of a financial transaction involving a loan, consumer financing arrangement, or other form of credit obligation, with repayment of the anticipated obligation typically extending over a number of months or years. As a part of the transaction, a policy of life insurance is arranged on the life of the debtor with the creditor named as beneficiary. The purpose of the policy is to *867 retire the balance of a debt should the debtor die prior to the end of the contemplated repayment period.
¶ 12. In Parnell v. First Savings & Loan Ass'n, 336 So.2d 764, 767-68 (Miss.1976), the supreme court held that "the inclusion of credit life insurance in a lender-borrower transaction is not for the sole benefit of, nor at the option of the lender." The Parnell case further holds that under Mississippi law, "credit life insurance is also a very important and vital part of the transaction to the borrower because it offers absolute protection to his estate for the unpaid balance of the debt in the event of his death before payment in full." Id. The distinct nature of credit life insurance has been recognized by the Mississippi Legislature, which has enacted separate insurance legislation regulating such contracts. See Miss.Code Ann. § 83-53-1 et seq. (Rev.1991).

DIRECT APPEAL:

I. WHETHER THE CHANCELLOR ERRED IN FAILING TO AWARD PUNITIVE DAMAGES.
¶ 13. Annie Barber argues on appeal that the chancellor erred in his finding that there was insufficient evidence to establish a finding of malice or gross negligence or disregard of the insured's rights. Specifically, Annie Barber contends that the following acts constituted a finding of malice or gross negligence or disregard of the her rights: 1) the "delay letter" sent by Balboa's employee, Mr. Ogasawara; 2) Mr. Ogasawara's initial testimony, which he later recanted, that stated he denied 50% of his claims; 3) Balboa's failure to produce approximately seventeen pages of a manual that allegedly did not exist according to Balboa, but was ultimately produced through a subpoena duces tecum; 4) Mr. Ogasawara's failure to sign the letters that were sent to Annie Barber which evidenced his apparent lack of concern for her; and 5) the remainder of Balboa's testimony.
¶ 14. Balboa contends that for a chancellor to award punitive damages, the following must be proven: 1) denial by the insurer of a legitimate claim by the insured for policy benefits; 2) that the insurer had no legitimate or arguable reason for denying the legitimate claim; and 3) that the insurer committed a willful, intentional or malicious wrong or acted with gross negligence or reckless disregard for the rights of [the] insured in denying the legitimate claim of the insured without a legitimate or arguable reason. See Pioneer Life Ins. Co. of Illinois v. Moss, 513 So.2d 927, 930 (Miss. 1987); State Farm Fire & Cas. Co. v. Simpson, 477 So.2d 242, 250-51 (Miss. 1985).
¶ 15. In A & S Trucking Co., Inc. v. First General Insurance Co., 578 So.2d 1212, 1215 (Miss.1990), the supreme court stated:
The trial judge is responsible for reviewing all the evidence before it in order to determine whether the issue of punitive damages should be submitted to the jury (or in this instance by the circuit judge as trier of fact). (citation omitted). On appeal, this Court reviews the briefs and all recorded evidence to determine the propriety of the trial judge's decision regarding submission to the jury. (citation omitted). The highway we travel in deciding bad faith cases is a well-marked one.(citation omitted). Only when an insurer has acted with malice or gross negligence or reckless disregard for an insured's right is the imposition of punitive damages appropriate. (citation omitted).
Moreover, "[P]unitive damages are not awarded to compensate a party for an injury, but are granted in the nature of punishment for the wrong doing of the defendant as an example so that others may be deterred from the commission of similar offenses, thereby, in theory, protecting the public." Kaplan v. Harco Nat'l Ins. Co., 716 So.2d 673 (¶ 34) (Miss. App.1998) (citation omitted). Thus, punitive damages are allowed only with caution *868 and within narrow limits. Blue Cross & Blue Shield of Mississippi, Inc. v. Maas, 516 So.2d 495, 497 (Miss.1987).
¶ 16. In the case sub judice, the chancellor found that since the language in the application for the certificate of insurance contradicted the language in the group policy, Balboa lacked an arguable reasonable basis for denying the claim. However, the chancellor found that this alone does not automatically lead to punitive damages. See Pioneer Life Ins. Co. of III., at 932. A further finding is required showing malice or gross negligence or disregard of the insured's rights. See Aetna Casualty & Sur. Co. v. Day, 487 So.2d 830, 832 (Miss.1986). The chancellor found that there was no evidence of such conduct, and after careful review of the record, we agree. Although this Court does not agree with nor condone Balboa's conduct, we do not believe that it amounted to malice or gross negligence or disregard of the insured's rights. This issue is without merit.
II. WHETHER THE APPELLANT IS ENTITLED TO AN ADDITUR AS TO COMPENSATORY DAMAGES.
III. WHETHER THE CHANCELLOR'S FINDINGS WERE AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE.
¶ 17. Since the same standard is applicable to both Issues II and III, they shall be discussed together. Annie Barber argues on appeal that the verdict was against the overwhelming weight of the evidence, and that the damages awarded to her are completely and totally insufficient to compensate her. Furthermore, Annie Barber contends that the chancellor's numerous findings of the damages Balboa's actions inflicted upon her combined with the uncontradicted testimony establishes that the chancellor's finding on compensatory damages was against the overwhelming weight of the evidence.
¶ 18. Balboa contends that the appellant has not presented any proof that the chancellor was influenced by bias, prejudice or passion in rendering his decision in this case or that the damages awarded were against the overwhelming weight of the credible evidence. Therefore, Balboa argues that the appellant has failed to meet her burden on this issue of additur, and the same should be denied. We agree.
¶ 19. A court's authority to order an additur is found in Miss.Code Ann. § 11-1-55 (Rev.1991), which provides:
The Supreme Court or any other court of record in a case in which money damages were awarded may overrule a motion for a new trial or affirm on direct or cross-appeal, upon condition of an additur or remittitur, if the court finds that the damages are excessive or inadequate for the reason that the jury or trier of the facts was influenced by bias, prejudice, or passion, or that the damages awarded were contrary to the overwhelming weight of the credible evidence. If such additur or remittitur be not accepted then the court may direct a new trial on damages only. If the additur or remittitur is accepted and the other party perfects a direct appeal, then the party accepting the additur or remittitur shall have the right to cross appeal for the purpose of reversing the action of the court in regard to the additur or remittitur.
"Pursuant to Miss.Code Ann. § 11-1-55, as additur may be granted by the court upon finding that the finder of fact was influenced by bias, prejudice or passion, or that the amount of the award was contrary to the overwhelming weight of the evidence." Wallace v. Thornton, 672 So.2d 724, 729 (Miss.1996). Further, in reviewing a request for an additur, the supreme court has stated:
The scope of appellate review in an additur appeal is limited to determining whether the trial court abused its discretion.... This Court has further noted that the party seeking the additur has the burden of proving his injuries, damages and loss of income. In determining *869 whether this burden is met, this Court must view the evidence in the light most favorable to the defendant, giving that party all favorable inferences that reasonably may be drawn there from....
Rodgers v. Pascagoula Public School District, 611 So.2d 942, 945 (Miss.1992) (citation omitted). Each case involving the issue of an additur must "necessarily be decided on its own facts." Leach v. Leach, 597 So.2d 1295, 1297 (Miss.1992).
¶ 20. To determine whether a verdict is against the overwhelming weight of the evidence, this Court must accept as true the evidence which supports the verdict; thus, we will reverse only when we are convinced that the trial court has abused its discretion in failing to grant a new trial. Nicolaou v. State, 612 So.2d 1080, 1083 (Miss.1992).
¶ 21. After careful review of the record and accepting as true all of the evidence which supports the verdict in this case, it is this Court's opinion that the verdict does not appear to be against the overwhelming weight of the evidence nor did the trial judge abuse his discretion when he refused to order an additur. Annie Barber presented evidence that at the time of her husband's death, she had incurred actual damages amounting to $17,277.57, extra-contractual damages amounting to $10,000.00, and mental anguish and emotional distress damages amounting to $50,000.00. The chancellor was correct when he stated:
[B]ut for the negligence of Balboa in delaying the investigation and denial of the claim, the Plaintiff would not have suffered the foreseeable mental anguish and/or the extent of such anguish which she suffered in being dunned and threatened with foreclosure and not knowing if the claims would be paid or denied.
The chancellor cited to Strickland v. Rossini, 589 So.2d 1268, 1275 (Miss.1991), which stated that the rule used to be that to recover damages for emotional distress, the plaintiff must prove: 1) an intentional or at least grossly negligent tort or 2) negligence accompanied by physical impact. The chancellor stated that this rule has been relaxed, and a plaintiff may recover for emotional injury proximately resulting from negligent conduct, if the injury was reasonably foreseeable by the defendant. See First National Bank v. Langley, 314 So.2d 324, 328 (Miss.1975); Wirtz v. Switzer, 586 So.2d 775, 784 (Miss.1991). Consequently, it is this Court's opinion that the amounts awarded to Annie Barber were sufficient and adequate compensation. Therefore, this issue is without merit.

IV. WHETHER THE CHANCELLOR ERRED IN DENYING THE APPELLANT'S MOTION FOR RECONSIDERATION.
¶ 22. Annie Barber argues on appeal that the chancellor erred in denying her motion for reconsideration[3] on the above three issues as well as on the issue of conversion. As the above three issues have already been fully discussed and are without merit, we shall not discuss them further. Balboa contends that the chancellor properly dismissed the conversion claim since they fully returned the premium paid on the policy to United, consistent with the terms of the master group credit life policy, normal business practices, and pursuant to Mississippi law. The chancellor dismissed the appellant's argument on conversion stating that "at a minimum there must be a demand by the Plaintiff, which the Defendant refuses. Sufficient proof was not provided of exactly what the Plaintiff demanded the return of from Balboa. *870 Exact language of Plaintiffs claim was not put into the record."
¶ 23. The case of Mississippi Motor Finance, Inc. v. Thomas, 246 Miss. 14, 20, 149 So.2d 20, 23 (1963)(quoting McJunkin v. Hancock, 71 Okla. 257, 176 P. 740, 742 (1918)), stated:
"To make out a conversion, there must be proof of a wrongful possession, or the exercise of a dominion in exclusion or defiance of the owner's right, or of an unauthorized and injurious use, or of a wrongful detention after demand."
After careful review of the record, it is this Court's finding that the conversion claim was properly dismissed. This issue is without merit.
CROSS-APPEAL:
V. WHETHER THE CHANCELLOR ERRED AS A MATTER OF LAW IN FINDING THAT REFUNDING THE PREMIUMS TO UNITED RATHER THAN TO THE APPELLANT AMOUNTED TO:
A. AN IMPROPER RESCISSION OF THE CERTIFICATES; AND
B. A RATIFICATION OF THE INSURANCE CERTIFICATES; OR
C. A WAIVER BY THE APPELLEE TO DECLARE THE CERTIFICATES VOID.
¶ 24. Balboa argues on cross-appeal that since the chancellor determined that L.C. Barber made material misrepresentations on both certificates and thus, Balboa had the right to void the certificates ab initio, the chancellor's conclusion of law regarding this issue was clearly erroneous. Furthermore, Balboa argues that according to Mississippi law, the requisite elements for ratification or waiver are simply non-existent.
¶ 25. As the appellee correctly stated, this Court will not disturb a chancellor's findings of fact unless the chancellor was manifestly wrong and not supported by substantial, credible evidence. Smith By and Through Young v. Estate of King, 579 So.2d 1250, 1251 (Miss.1991); Bell v. Parker, 563 So.2d 594, 596-597 (Miss.1990). However, this rule does not apply to questions of law. When presented with a question of law, the manifest error/substantial evidence rule has no application and we conduct a de novo review. Cooper v. Crabb, 587 So.2d 236, 239 (Miss.1991); Holliman v. Charles L. Cherry & Associates, 569 So.2d 1139, 1147 (Miss.1990); Planters Bank & Trust Co. v. Sklar, 555 So.2d 1024, 1028 (Miss.1990).
¶ 26. In Mississippi State Hwy. Dept. v. Bethlehem Baptist Church, 232 Miss. 335, 338, 99 So.2d 221, 222 (1957), the supreme court quoted the case of Crabb v. Wilkinson, 202 Miss. 274, 279, 32 So.2d 356, 357 (1947), and stated:
Where a party, with knowledge of facts entitling him to rescission of a contract or conveyance, afterward, without fraud or duress, ratifies the same, he has no claim to the relief of cancellation. An express ratification is not required in order thus to defeat his remedy; and acts of recognition of the contract as subsisting or any conduct inconsistent with an intention of avoiding it, have the effect of an election to affirm.
¶ 27. In a more recent case, Edwards v. Wurster Oil Co., Inc., 688 So.2d 772, 776 (Miss.1997), the supreme court cited to the case of Turner v. Wakefield, 481 So.2d 846, 848-49 (Miss.1985), where the Court addressed the issue of ratification of contracts which are allegedly based on fraud.
The appellee alleged that it had been fraudulently induced into the execution of a promissory note to the appellant. The appellee, however, continued to make payments on the note for eleven months after being advised of its potential invalidity.... The Court held that "upon discovery thereof [of fraud], the one defrauded must act promptly and finally to repudiate the agreement; however, a continuance to ratify the contract constitutes a waiver." (citation omitted). Thus, this Court's holding was in accord with its previous holdings in Koenig and *871 Crabb that acts recognizing a contract as subsisting constitute acceptance of the terms of that contract....
¶ 28. In the case at bar, the chancellor found that L.C. Barber had made a material misrepresentation on his applications for credit life insurance, and thus, Balboa had the right to void the certificates ab initio. However, the chancellor also concluded that for Balboa to properly rescind the contract, they had a duty to return the premiums to the appellant. The chancellor held that Balboa's return of the premiums to United essentially "ratified" the contract; thus, the insurance policies were "revived" for all purposes. The chancellor stated:
Balboa wishes to ratify or follow the incontestability language of the contract as the basis of its investigation after the claim had been filed. Then, after investigation which it arguably may only do in Mississippi after Lewis [v. Equity Nat'l Life Ins. Co., 637 So.2d 183 (Miss. 1994)] based upon the incontestability clause, it wishes to dissolve the contract from its inception based upon a material misrepresentation, prohibiting as a matter of law any consideration of its own promises. Then it wishes to again ratify or follow the language of the contract, and most probably the wishes of its agent[,] United, by returning the premiums not to the applicant, but to the lender. The Court, having reviewed the statutes pertaining to credit life insurance and finding no contrary law, is of the opinion that Balboa cannot have it both ways. Either the policy was voided requiring a return of [the] premiums to the applicant or the contract was in effect allowing Balboa to elect to whom the premiums would be returned as stated in the clause in the Group Policy entitled "APPROVAL OF RISKS." This Court finds that the return of the premiums to United was a ratification of the language of the contract which revived the contract for all purposes.
Furthermore, the chancellor stated that he was aware that "a return of premiums is not essential to the avoidance of a policy, nor is its retention a waiver, especially where the insured was guilty of fraud in obtaining the policy or where knowledge of the ground of avoidance is first obtained after a loss. The chancellor found that in this case the payment of the premiums was an affirmative act, not merely a retention. Additionally, the chancellor stated that the intent of L.C. Barber as to fraud was never proven.
¶ 29. Moreover, the chancellor held that where the language of the contract is unambiguous, the contract is to be construed as written. However, where the language is ambiguous, the language is to be construed in favor of the insured. See Ford v. Lamar Life Ins. Co., 513 So.2d 880 (Miss. 1987). The chancellor found that the application of insurance was inconsistent and ambiguous when compared to the clauses of the Group Policy. The chancellor stated:
The language in the Group Policy infers that some action, other than the asking of a health question in the application, will be taken within a thirty day period to determine if the applicant is "found" to be an acceptable risk. The plain meaning of the clause as interpreted in favor of the insured is that the insurance will become effective on the Effective Date based upon the acceptance of the applicant as an insurance risk by the Company, or the applicant will receive notice that the insurance is not effective within thirty days of the Effective Date (i.e. the date of indebtedness). In spite of the extensive and moronic use of the word "effective" throughout this policy either by accident or by design, once the insured accepted this responsibility, and the thirty days passed with no notice being given, it had accepted the risk and was obligated to pay.
Thus, since no notice was given to the insured, the chancellor found that the insurance *872 company was bound to pay, and failure to do so was a breach.
¶ 30. It is this Court's opinion that the element for ratification and waiver were met, and that the chancellor properly held that Balboa's rescission was improper which ratified and revived the contract; thus, placing it again into existence and allowing its four corners to be interpreted to determine the obligations and duties of the parties, and the existence of any breach. Therefore, the chancellor's finding for actual damages in the amount of $17,277.57 is affirmed. Furthermore, as the appellee's second issue was previously discussed above in issues II and III, this Court need not discuss them further.
¶ 31. THE JUDGMENT OF THE FORREST COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, P.J., COLEMAN, DIAZ, IRVING, LEE, PAYNE, AND THOMAS, JJ., CONCUR.
SOUTHWICK, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY McMILLIN, C.J.
SOUTHWICK, P.J., dissenting.
¶ 32. The central determination upon which everything else in this case turns is simple. Does an insurance company thwart its attempt to rescind by refunding premiums on a credit life policy to the creditor through whom the premiums were paid instead of directly to the insureddebtor? Without any express authority, both the trial court and the majority here hold that of course the premiums must be refunded to the debtor and the right to rescind has been waived by the failure to so. In my view the holding cites but then does not apply the rule that waiver of rescission does not occur unless some act occurs that recognizes the agreement and treats it as being in effect. Whatever returning the premiums to the wrong party might be, it is not that. I would find that the policy was rescinded and the array of damages already awarded and others still sought should be denied.
¶ 33. First, the reasoning of the trial judge and the majority should be summarized. The misrepresentation on the application for insurance regarding health problems did entitle Balboa to rescind. The policy itself stated that if rescission occurred, the premiums were to be refunded to the creditor. However, the majority concludes that a rescission means that the policy never came into existence and therefore the policy cannot control anything regarding the duties of the parties. Consequently, general principles require that the amount paid to enter a contract be refunded to the person who made the payments. Failure to refund in the proper manner waived the rescission, left the policy in effect, and gave rise to a cause of action for failing to pay a legitimate claim.
¶ 34. It is obvious that the entire weight of the result must be borne by the single support that refunding to the creditor instead of the debtor waived the rescission, even though the policy required that the premiums be refunded in that way.
¶ 35. Next I look more closely at certain elements of the majority's analysis. The policy of insurance was a group policy that was available when debtors obtained loans from the mortgage company. After Balboa investigated and found the misrepresentation regarding health problems, it sent notice on May 19, 1994, to Mrs. Barber that it was rescinding coverage. Balboa notified the lender of the same thing and instructed it to refund the premiums. Under the policy language that will be quoted below, the lender instead credited the premium amount to the unpaid balance on the loan.
¶ 36. The alleged defect in the insurance company's actions was in failing to have the refund sent to the borrower, the individual whose husband in fact was never insured because of the misrepresentation that led to the rescission.
*873 ¶ 37. Two documents are relevant in resolving the problem, and they are the standard ones for this kind of insurance. By statute, if a group credit life policy is in effect for a lender, then a certificate of insurance will also be issued to each borrower. Miss.Code Ann. § 83-15-13 (Rev. 1991). In this case, both the group policy and the individual certificate were introduced into evidence.
¶ 38. The group policy provided that if a borrower was found by the insurance company to be an unacceptable risk, the insurance would not become effective. Notice of the ineffectiveness of coverage would be mailed to the debtor and to the lender while the premium would be refunded and "paid to the Borrower or credited to such Borrower's account." The Barbers would not have seen this group policy. The separately issued certificate of insurance makes no statement about the return of a premium other than in the situation of a contract that has become effective and is then terminated. In that event, the insured was to be paid the remaining premium. Balboa argues that we should apply a similar provision in the group policy dealing with refunds when "insurance which becomes effective hereunder is terminated prior to its Scheduled Expiration Date...." That provision specifically allows the refund to go first to the creditor on the loan, who then will refund in some manner. However, here the contract was found to be void ab initio and consequently was not effective. Regardless, the applicants had no knowledge of the term even if it did apply because it was in the group policy which they never saw. We need not decide whether "terminate" has to mean a policy first validly in effect as opposed to one that never came into effect.
¶ 39. Therefore the documents executed by the borrowers themselves did not explicitly discuss refund of premiums if the contract was voided. I believe we must then determine what is required for rescission irrespective of the documents, and then determine whether the documents or Balboa's actions kept rescission from being effective.
¶ 40. The right to rescind, among other bases, arises when one party's agreement to a contract is premised on a fraud or misrepresentation of the other party. Turner v. Wakefield, 481 So.2d 846, 848-49 (Miss.1985). Both the majority and the trial judge found that the right to rescind existed here. The question is the validity of its exercise. The majority relies on case law that concludes that ratification, not rescission, occurred because Balboa, "with knowledge of facts entitling [it] to rescission of a contract or conveyance, afterward, without fraud or duress, ratifies the same ... [through] acts of recognition of the contract...." Crabb v. Wilkinson, 202 Miss. 274, 279, 32 So.2d 356, 357 (1947). Another case relied upon by the majority found ratification when the party who had been fraudulently induced to execute a promissory note, continued to make payments on the note for eleven months after learning of the possible fraud. Turner v. Wakefield, 481 So.2d at 849.
¶ 41. Those cases appear eminently correct and undeniably different than the present case. The insurance company's alleged ratification or waiver was to send notice to the plaintiffs that coverage was canceled and that the premium had been returned to the lender. At most the majority says that technically the money needed to be returned to the borrower directly, a point with which I disagree, but which I also find to be immaterial. Nothing in the possible mistake in reimbursement of premiums to the wrong party, when the fact of return was clearly transmitted to the applicant, would have led to any misunderstanding of the company's intentions. Balboa did not treat the contract as "a subsisting obligation" after the discovery of facts that would entitle it to rescission. Matheney v. McClain, 248 Miss. 842, 848, 161 So.2d 516, 519 (1964).
¶ 42. In fact, there is little that could be clearer about Balboa's intent to repudiate the contract. Again, at most its procedure *874 was flawed but there was no misleading. By not being misled, Mrs. Barber was in a position to contact, discuss, argue, and even sue for a refund if she felt that the money should have been returned to her instead of credited to the loan for which the insurance was issued in the first place. There was a prompt and clear repudiation of the agreement, which is what is necessary to avoid the doctrines of waiver or ratification. Turner, 481 So.2d at 849. Once the claim was investigated, Balboa returned the premium to the lender. The company retained none of the benefits of the agreement nor led other parties to believe that it had. This is a clear repudiation.
¶ 43. Moreover, the lower court even referred to the case law that a return of the premiums is not required for rescission. The supreme court has held the following:
The chancellor, in our opinion, erred in holding that, since the appellant had not returned the premium and had made no effort to have the contract of insurance cancelled, the appellant had elected to waive its right to cancel the contract. The appellant, under the facts in this case, was not required to return the premium as a condition precedent to the avoidance of liability on the policy.
State Farm Mutual Automobile Insurance Co. v. Calhoun, 236 Miss. 851, 868, 112 So.2d 366, 373-74 (1959). Such cases indicate that there is an issue when an insured has procured a policy by fraud, of whether he is even entitled to recovery of the premium. But even if it had to be returned, it was not a condition precedent to rescission. Though I do not question the obligation of the company here to return the premium, I disagree that it had to be returned to the applicant or else there had been something less than a clear repudiation.
¶ 44. There is another reason that I do not find that the money had to be returned to the insured. As the supreme court has held, credit life insurance is an unusual species, sui generis perhaps, of insurance. "This Court recognizes that credit life insurance is a unique product within the insurance field." Tew v. Dixieland Finance, Inc., 527 So.2d 665, 669 (Miss.1988). It is tripartite as the lender is a third party very much in the center and usually the initiator of the application. Id. at 670. Returning the money to the lender for the credit of the borrower may be the equivalent of returning it to the borrower. It certainly is not being retained by the insurer, anyway.
¶ 45. Waiver of the right to rescind has never been found to arise merely from error by the rescinding party, but it arises from an error that indicates an acceptance of the bargain and a continuing to treat the agreement as in effect. That simply did not occur here.
¶ 46. There are many doubts about Balboa's practices in this case. Though I find no basis on which to find waiver of rescission, there are other issues. Mrs. Barber argues that the company was performing its underwriting only after a claim was made. The supreme court almost seemed to make a blanket prohibition in one case, that if the application for insurance was not investigated until after a claim was made, that was too late for purposes of denying coverage. Lewis v. Equity Nat. Life Ins. Co., 637 So.2d 183, 189 (Miss. 1994). However, the chancellor here held that Lewis did not override the express provision in the agreement between the parties that for the period of the incontestability clause the applicant had to understand that a misrepresentation on the application might cause the policy to be voided. That appears correct to me.
¶ 47. I would not deny the right to rescind because of the failure to investigate the representations about the applicant's health. The chancellor had substantial evidence to find that the applicant knew of his health problems, misrepresented them on the application, but had to be aware that for the incontestability period that *875 there was a chance these would void the policy. If that is so, then the Lewis statements about post-claim underwriting appear inapplicable. I further agree that but for the misrepresentation, there would have been no insurance. That being said, I cannot find waiver based on the failure to return the premium to the applicant when the supreme court has held that the return of the premium is not a condition precedent to rescission. What is a condition, precedent and subsequent, is for the company not to treat the policy as in effect. That it never did in any way.
McMILLIN, C.J., JOINS THIS SEPARATE OPINION.
NOTES
[1] In the case sub judice, both certificates contained the following provision and question:

I(we), the undersigned Proposed Borrower(s), hereby apply for the credit insurance coverage(s) checked above in connection with the loan for which I am (we are) applying. To the best of my (our) knowledge, the answers given to the questions below are true. (If insurance is desired only on the Proposed Primary Borrower, only those questions applicable to the Proposed Primary Borrower need be answered).
LIFE
1. Have you during the past three (3) years received medical advice, consultation, or treatment for: cancer, high blood pressure, hypertension, hemorrhage, heart disease, stroke, diabetes, alcoholism, drug addiction, acquired immune deficiency syndrome (AIDS) or AIDS related complex (ARC)?
Both certificates also contained the following clauses:
WHAT THE CONTRACT IS AND HOW YOUR STATEMENTS AFFECT IT
This Certificate, the Group Policy and your Application, if any, are the complete Contract of Insurance. All statements made by you in your Application are considered to have been made to the best of your knowledge and belief. No statement can be used to void this Insurance or deny a claim unless the statement is in your signed Application. After two (2) years during your lifetime, from the Effective Date, no statement made by you can be used to void this insurance or deny a claim.
INCONTESTABILITYFOR TRUNCATED COVERAGE ONLY
Insurance for loans with a net amount under $1,000 shall be incontestable ninety (90) days and loans with a net amount of over $1,000 shall be incontestable twelve (12) months from the date of issue. No benefits shall be reduced or denied due to death except in cases of fraud or suicide.
The Group Policy further provided:
EFFECTIVE DATE OF INDIVIDUAL COVERAGE
Insurance on the life of any Borrower Insured hereunder with respect to a particular debt shall become effective concurrently with the inception of such indebtedness to the Creditor or on the Effective Date of this Group Policy, whichever is later, subject to acceptance by the Company within thirty (30) days of such date.
APPROVAL OF RISKS
If, according to our underwriting rules, an eligible Borrower is found to be unacceptable as an insurance risk, his or her insurance shall not become effective. Notice to this effect shall be mailed to the Borrower and the Creditor withing[within] thirty (30) days from the Effective Date. A refund of the premium will be paid to the Borrower or credited to such Borrower's account.
[2] According to Annie Barber, she was unaware of her husband's cancer, and was told that the amputation of his toe was due to a large object falling on it.
[3] Pursuant to Rule 59 of M.R.C.P., relief following judgment is on motion for a new trial, not on motion to reconsider. Motions to reconsider, as previously known in practice and procedure in Mississippi prior to the adoption of the Mississippi Rules of Civil Procedure, have for all purposes and intent, been abolished and superceded by the aforementioned Rule 59 of M.R.C.P. It is suggested that the appellant apply Rule 59 of M.R.C.P. in the future under similar circumstances.